RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0126p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SHEYA MANDEBVU; MTANDAZO MANDEBVU; TINOTENDA MANDEBVU; TATENDA MANDEBVU,

        *Petitioners*,

        *v.*

ERIC H. HOLDER, JR., Attorney General,

        *Respondent*.

No. 11-3969

On Petition for Review of a Final Order
of the Board of Immigration Appeals.
Nos. A088 187 411; A088 187 412;
A088 187 413; A099 786 848;

Argued: October 4, 2012

Decided and Filed: June 18, 2014

Before: MERRITT, MOORE, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Scott E. Bratton, MARGARET WONG & ASSOCIATES CO., LPA, Cleveland, Ohio, for Petitioners. Daniel I. Smulow, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Margaret Wong, MARGARET WONG & ASSOCIATES CO., LPA, Cleveland, Ohio, for Petitioners. Daniel I. Smulow, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

    MOORE, J., delivered the opinion of the court, in which MERRITT, J., joined. MERRITT, J. (pg. 21), delivered a separate concurring opinion. McKEAGUE, J. (pp. 22–27), delivered a separate dissenting opinion.

1

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  For more than two decades, Robert Mugabe has exercised power as the repressive head of state of Zimbabwe.  Although he has permitted official national elections in recent years, Mugabe's Zimbabwe African National Union-Patriotic Front ("ZANU-PF") party has maintained control of the political process through violence and corruption, specifically targeting members of the opposition for killings, abductions, and other forms of abuse.  Sheya and Mtandazo Mandebvu are two individuals who spoke out in criticism of ZANU-PF and Mugabe's government.  After traveling to the United States with their two children, Tinotenda and Tatenda,[1] the Mandebvus eventually sought asylum and withholding of removal because they fear that they will be persecuted for their opposition to ZANU-PF if they are forced to return to Zimbabwe.

The Board of Immigration Appeals ("BIA") affirmed the Immigration Judge's ("IJ") denial of the Mandebvus' applications for asylum and withholding of removal. Because the IJ's decision that the asylum applications were untimely was infected by legal error, we GRANT the Mandebvus' petition with respect to their asylum claims and REMAND the case to the BIA for reconsideration.  With respect to the claims for withholding of removal, we likewise GRANT the Mandebvus' petition because the record evidence compels the conclusion that it is more likely than not that the Mandebvus will be persecuted on the basis of their political opinion or tortured if forced to return to Zimbabwe.

**I.  BACKGROUND**

In 1999, Sheya and Mtandazo Mandebvu married in Zimbabwe. A.R. 168 (Hr'g Tr. at 51).  They were both schoolteachers.  Neither Sheya nor Mtandazo were official members of any political party in Zimbabwe, but both were openly critical of ZANU-PF and the Mugabe government.  Sheya criticized the government to his students and his fellow teachers, prompting

_____

[1]The Mandebvus have a third child who was born in the United States and is therefore not subject to removal.

several reprimands from the headmaster of his school. *Id.* at 172, 174–75 (Hr'g Tr. at 55, 57–58). He was also forced to attend several political rallies in support of ZANU-PF. *Id.* at 171 (Hr'g Tr. at 54). On July 2, 1999, Sheya left Zimbabwe and entered the United States on a student visa. *Id.* at 169 (Hr'g Tr. at 52). From 1999 to 2006, he attended two universities in Ohio, earning a Masters in Marketing and Communication and an MBA in Entrepreneurship. *Id.* at 170 (Hr'g Tr. at 53). He has never returned to Zimbabwe. *Id.*

When Sheya immigrated to the United States, Mtandazo stayed in Zimbabwe with their children and continued teaching. Like Sheya, she was openly critical of the government and was forced to attend ZANU-PF rallies. *Id.* at 274–76 (Hr'g Tr. at 157–59). After Mtandazo refused to attend one rally in August 2000, ZANU-PF Youth Brigade ("Youth Brigade") members came looking for her on suspicion that she supported the Movement for Democratic Change ("MDC") party, an opposition party. *Id.* at 286–87 (Hr'g Tr. at 169–70). Mtandazo feared that she would be killed because at that time newspapers were reporting that ZANU-PF members had begun visiting schools and rounding up teachers suspected of opposing ZANU-PF. *Id.* at 285 (Hr'g Tr. at 168). Mtandazo and her children went into hiding for several days before Mtandazo would return to her job. *Id.*; *see also id.* at 180–81 (Hr'g Tr. at 63–64).

The confrontation over the political rally was not Mtandazo's last encounter with ZANU-PF. A week later, the Youth Brigade erected a road block and stopped the car in which Mtandazo and two other teachers were passengers. They questioned Mtandazo about her political activities and accused her of working for MDC. They also confiscated her cell phone on the suspicion that she was using it to communicate with MDC members. *Id.* at 183, 289 (Hr'g Tr. at 66, 172). Although the Youth Brigade allowed Mtandazo to leave unharmed, they took the other two teachers to a camp, where they were beaten and forced to repeat ZANU-PF slogans. *Id.* at 184, 291 (Hr'g Tr. at 67, 174). Fearing for her life, in September 2000 Mtandazo took her children and joined Sheya in the United States. *Id.* at 185 (Hr'g Tr. at 68).

The Mandebvus' family members also drew the attention of ZANU-PF. All five of Sheya's brothers were confronted by ZANU-PF members regarding their suspected support of MDC. Thomas participated in demonstrations against the government and organized community activities to encourage support for MDC. *Id.* at 187–88 (Hr'g Tr. at 70–71). ZANU-PF

members beat him and confiscated his truck because they believed he was "being used by white farmers." *Id*. at 188–89, 321 (Hr'g Tr. at 71–72, 204). Efraim also recruited for MDC. ZANU-PF members threatened to kill him and took him to a "reeducation" camp, where he was beaten and treated "in a degrading way." *Id*. at 197 (Hr'g Tr. at 80). Enywear organized rallies and recruited members for MDC. Youth Brigade members beat him and forced him to recite ZANU-PF slogans. *Id*. at 209 (Hr'g Tr. at 92). Kennedy also organized rallies for MDC. ZANU-PF members warned him to stop supporting MDC, but it is not clear whether they physically harmed him. *Id*. at 211, 326 (Hr'g Tr. at 94, 209). Onward was monitored by government agents because they believed that he was using his position at the University to influence students against ZANU-PF. *Id*. at 201 (Hr'g Tr. at 84). All of Sheya's brothers and sisters, except for Kennedy, have since fled the country or gone into hiding. *Id*. at 189, 198, 201, 206, 209 (Hr'g Tr. at 72, 81, 84, 89, 92).

The Mandebvus' parents have also been harassed by ZANU-PF members. In 2008, the Youth Brigade stopped a bus on which Sheya's mother, Edith, was a passenger. They demanded that the passengers produce ZANU-PF membership cards, and passengers who could not do so were taken away to "reeducation" camps. Edith did not have a membership card. Youth Brigade members took her to a camp where she was beaten so severely with iron rods and sticks that she later died from her injuries. *Id*. at 202–05, 327–28 (Hr'g Tr. at 85–88, 210–11). Mtandazo heard that her mother was also beaten to death after she complained to ZANU-PF war veterans about being removed from food distribution lists. *Id*. at 216, 299–300 (Hr'g Tr. at 99, 182–83).

ZANU-PF members have been monitoring the Mandebvus and encouraging their return since they fled to the United States. Beginning in 2000, the Youth Brigade started harassing Mtandazo's mother, Edna, asking where Mtandazo was living and instructing Edna to encourage Mtandazo to return to Zimbabwe. *Id*. at 295 (Hr'g Tr. at 178). In December 2005, Sheya's father, Samuel, visited Sheya to celebrate his graduation. *Id*. at 191–92 (Hr'g Tr. at 74–75). When Samuel returned to Zimbabwe in April 2006, he was detained and questioned by government officers, who wanted to know Sheya's address in the United States. *Id*. at 192 (Hr'g Tr. at 75). ZANU-PF officers removed Samuel from his position as head of the village and confiscated his cattle. *Id*. at 193–95 (Hr'g Tr. at 76–78). Mtandazo's father was similarly questioned regarding her whereabouts and activities when he returned to Zimbabwe from visiting

her in the United States. *Id*. at 220, 305 (Hr'g Tr. at 103, 188). During this encounter, ZANU-PF members beat Mtandazo's father. *Id*. at 307 (Hr'g Tr. at 190). As late as the summer of 2009, Mtandazo's father reported that government agents continued to search for her. *Id*. at 304–06 (Hr'g Tr. at 187–89).

As they grew more concerned with deteriorating conditions in Zimbabwe, Sheya and Mtandazo became active with an arm of MDC in the United States. *Id*. at 212–13 (Hr'g Tr. at 95–96). Eventually, both Sheya and Mtandazo became official members[2] and began recruiting other new members and organizing meetings. *Id*. at 213 (Hr'g Tr. at 96). In 2004 or 2005, concluding that conditions in Zimbabwe were not improving, the Mandebvus decided that they would seek asylum. *Id*. at 220–21, 331 (Hr'g Tr. at 103–04, 214). They attempted to file for asylum in 2005 but, through no fault of their own, the applications were never filed. *Id*. at 221–27 (Hr'g Tr. at 104–10). They did not make another attempt to file their applications at that time.

The Mandebvus were served with notices that they were subject to removal for overstaying their visas in August 2007. They filed applications for asylum and withholding of removal on September 12, 2008. At a hearing regarding their applications, both Sheya and Mtandazo testified about the abuses perpetrated against family members who had remained in Zimbabwe. Sheya explained that he feared for his own safety and for that of his family if he were to be forced to return to Zimbabwe after so many years:

> I fear that I would be picked up right at the airport. I fear that I would disappear or be imprisoned without trial. I fear that I return to a country that is still under Mugabe's regime. I fear that Mugabe's agents will come after me. I even fear that they might kill me.
>
> . . .
>
> . . . [T]hey don't view people that come back from America as people that would be for the government and so I fear that I would . . . [be] picked up and interrogated and . . . even be killed.

---

[2]Sheya testified that he became an official member of MDC in 2005, A.R. 212 (Hr'g Tr. at 95), but his membership card shows that he did not join until October 2007. *Id*. at 244 (Hr'g Tr. at 127). He also had difficulty recalling the full name of the MDC party. *Id*. at 178, 249 (Hr'g Tr. at 61, 132). Mtandazo explained that both she and Sheya had "minimal" involvement with the party as early as 2003, but did not officially join until 2007. *Id*. at 311–12 (Hr'g Tr. at 194–95).

. . .

> I fear for my family.  I fear for my children.  I fear that [Mugabe's people]
> might kill them.

*Id.* at 230–31 (Hr'g Tr. at 113–14).  Mtandazo also explained that she fears being killed if she returns to Zimbabwe "[s]ince they were looking for [her] this whole time."  *Id.* at 344 (Hr'g Tr. at 227).

Both Sheya and Mtandazo referred to events surrounding the 2008 elections when describing their fear of returning to Zimbabwe.  Robert Mugabe's ZANU-PF political party has dominated the country's government since 1987, largely through intimidation and violence.  However, during the 2008 elections, MDC gained a parliamentary majority for the first time.  The 2008 presidential election went to a run-off, which Mugabe won only after his challenger withdrew in protest against the violence perpetrated by ZANU-PF.  *See id.* at 635 (2008 Country Report at 1).  During the 2008 elections, ZANU-PF supporters engaged in widespread violence and intimidation, including abductions, torture, and killings, in an effort to discourage opponents from voting.  It is this increase in violence directed against individuals opposed to ZANU-PF that convinced the Mandebvus that it was even more likely in 2008 than when they first fled Zimbabwe that they would face persecution from the government upon their return.  *Id.* at 231–32, 345–46 (Hr'g Tr. at 114–15, 228–29).

At the removal hearing, Dr. Wenceslous Koswoswe also testified on the Mandebvus' behalf.  Dr. Koswoswe is a member of the MDC and has conducted research on speech and broadcasting restrictions in Zimbabwe.  During a 2003 research trip to Zimbabwe, Dr. Koswoswe obtained his MDC membership card and interviewed several MDC members in their headquarters.  *Id.* at 370–71 (Hr'g Tr. at 253–54).  As he left MDC headquarters, several government officials stopped him for questioning and searched his belongings.  He was not physically harmed during this encounter, and his research was not confiscated or destroyed.  *Id.* at 387 (Hr'g Tr. at 270).

After the hearing, the IJ issued an oral decision.  *Id.* at 84–109 (IJ Dec.).  The IJ found the Mandebvus and their witnesses highly credible, although he expressed skepticism about the sincerity of their support for MDC.  He concluded that the asylum application was time-barred and that country conditions had not materially changed in a manner sufficient to excuse late

filing. He also concluded that it was not probable that the Mandebvus would be persecuted or tortured if forced to return to Zimbabwe. The Mandebvus appealed to the BIA, which issued a decision affirming the IJ. *Id.* at 3–4 (BIA Dec.). This timely appeal followed.

On October 4, 2012, after we heard oral argument, we encouraged the parties to explore whether there was some means by which the Mandebvus could remain in the United States legally. We held the case in abeyance. By April 10, 2013, both of the Mandebvus' daughters had been granted prosecutorial discretion, and they are thus no longer subject to removal. On January 7, 2014, the government offered a grant of prosecutorial discretion, subject to certain employment restrictions, to the Mandebvus. Sheya and Mtandazo declined the offer and indicated that they wished this case to proceed. Accordingly, we now adjudicate the Mandebvus' petition for review.

## II. STANDARD OF REVIEW

When "the BIA adopts and affirms the IJ's opinion, but provides additional reasons for its ruling, we review the IJ's opinion as well as the BIA's additional reasons." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008); *see also Haider v. Holder*, 595 F.3d 276, 281 (6th Cir. 2010). All legal determinations made by the IJ or BIA are reviewed de novo. *Zoarab*, 524 F.3d at 780. Factual findings are reviewed deferentially under a substantial-evidence standard: they are upheld if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole," *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)), and may be reversed only if the evidence "not only supports a contrary conclusion, but indeed *compels* it." *Yu v. Ashcroft*, 364 F.3d 700, 702–03 (6th Cir. 2004) (quoting *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)). That is, we uphold the BIA's determinations unless they are "manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). Because the IJ found the Mandebvus credible, we accept their factual statements as true. *Zoarab*, 524 F.3d at 780.

## III. ASYLUM

The Mandebvus argue that the BIA erred by dismissing their applications for asylum as untimely and failing to consider the merits of their asylum claims. An asylum applicant must "demonstrate[] by clear and convincing evidence that the application has been filed within 1 year

after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). If an applicant does not file within the one-year time limit, his application nonetheless may be considered if he "demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." *Id.* at § 1158(a)(2)(D). The Mandebvus concede that there are no "extraordinary circumstances" to justify the delay in filing, but they argue that the uptick in violence during the 2008 Zimbabwean elections constitutes "changed circumstances" that excuse non-compliance with the one-year deadline.

The immigration judge explained his finding that the Mandebvus failed to demonstrate changed country conditions adequate to satisfy § 1158(a)(2)(D) as follows:

> [T]he respondents argue that the 2008 elections [in Zimbabwe] constitute changed circumstances. Changed circumstances have to be a change in circumstance that materially affects the asylum eligibility of the individuals involved. Now the respondents' basis for their asylum claim is a fear of persecution which they assert they had starting at the latest in 2004, or as early as 2000 according to Mrs. Mandebvu. They then made an attempt to file for asylum.

> The events following the 2000 [sic] elections, while they did result in an incremental change in the conditions in Zimbabwe, certainly, in the judgment of the Court, are not a change that materially affects the eligibility of these two individuals for asylum. *They claim, and their attorney claims, that they were eligible before 2008, and they claim that they are eligible after the events in 2008.*

> They also claim that their election to join the MDC organization in the U.S. will somehow materially affect their eligibility for asylum and if they were eligible before, it may be another piece of evidence to help their case for asylum. But it certainly does not, in the judgment of the Court, materially affect their eligibility for asylum. *Such an event would be more in the line of a change of government in Zimbabwe, whether respondents would suddenly be subject to persecution where they would not have been before* or changes in their personal circumstances that materially affect their eligibility for asylum, and the Court just does not see that the incremental change was not that Zimbabwe changed from a nice place to an awful place in 2008; *it is that Zimbabwe changed from a not very nice place to an even not very nicer place. It got worse incrementally. But the Court does not see that as a change in country conditions that materially affects the eligibility of these respondents for asylum.*

A.R. 100–01 (IJ Dec. at 17–18) (emphasis added). The BIA echoed the IJ's assumption that an "incremental change" was insufficient to support a finding of changed country conditions:

"While the respondent claims conditions in Zimbabwe changed with the elections of 2008, the Immigration Judge found only an incremental change. Before and after the 2008 elections, the Country Reports state that the government engaged in pervasive and systematic abuse of human rights." *Id.* at 4 (BIA Dec. at 2) (citation omitted). Thus, the IJ and the BIA both construed the statute as requiring that applicants asserting an exemption from the asylum filing deadline because of "changed conditions" be ineligible for asylum before the asserted change.

Federal courts ordinarily lack jurisdiction to review the BIA's determination that an asylum application was not timely filed. *Id.* at § 1158(a)(3). However, under the REAL ID Act of 2005, we retain our jurisdiction to review applications that were denied for untimeliness if the applicant "seeks review of constitutional claims or matters of statutory construction." *Khozhaynova v. Holder*, 641 F.3d 187, 191 (6th Cir. 2011) (quoting *Shkulaku-Purballori v. Mukasey*, 514 F.3d 499, 502 (6th Cir. 2007)). The Mandebvus argue that the IJ erred in interpreting the statute when he determined that an "incremental change" in conditions in Zimbabwe was categorically insufficient to constitute a change that would materially affect an applicant's eligibility for asylum. *See* § 1158(a)(2)(D).

Challenges to the denial of an asylum application as untimely are often dismissed for lack of jurisdiction because they ask the court to reweigh the evidence in the petitioner's favor. *See Khozhaynova*, 641 F.3d at 191 (challenging the district court's factual determination that the petitioner's responsibility to care for her son did not prevent her from filing for asylum); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006). For example, in *Almuhtaseb*, we considered the asylum claim of a Palestinian woman who argued that she would be persecuted if she were forced to return to the West Bank, where violence had escalated in the period of time before she filed her application. In determining that we lacked jurisdiction to entertain Almuhtaseb's appeal, we reasoned that "an assessment of Almuhtaseb's argument regarding changed circumstances would require us to consider evidence regarding the nature of the violence in the West Bank to determine whether, as a matter of fact, Palestinians had become targets of violence on the basis of their nationality and political views." *Id.* at 748.

Unlike the claim presented in Almuhtaseb's petition, the Mandebvus' appeal does not require this court to revisit the evidence submitted in support of their claim. We accept (1) the

IJ's factual conclusion that there was only an "incremental change" in conditions that "changed [Zimbabwe] from a not very nice place to an even not very nicer place" and (2) his characterization that the Mandebvus argued they were eligible for asylum both before and after the events of 2008.  A.R. 100–01 (IJ Dec. at 17–18).  We may do so because, even if we accept all of the IJ's factual conclusions regarding country conditions as true, we may still determine that the IJ erred as a legal matter.  The Mandebvus' appeal asks us to determine as a matter of law whether the IJ improperly required that they prove something not required by the statute.  Therefore, the Mandebvus' challenge relates to the construction of the relevant statutory language, and we have jurisdiction to review it.

Turning to the merits of the Mandebvus' claim, we conclude that the IJ's construction of the statute was impermissibly narrow.  The IJ concluded that an "incremental change" from poor country conditions to worse country conditions was insufficient to constitute "changed circumstances which materially affect the applicant's eligibility for asylum," § 1158(a)(2)(D), because it did not tip the scale such that "respondents would suddenly be subject to persecution where they would not have been before."  A.R. 101 (IJ Dec. at 18).  That is, the IJ interpreted the statutory language to require that an asylum applicant, in order to excuse a delay in filing beyond the one-year deadline, demonstrate that he would not have been eligible for asylum had he applied before the change in country conditions.  The Mandebvus argue that they are eligible for the changed-circumstances filing extension even if they would have been eligible for asylum before the events that changed their circumstances.

As "[i]n all cases of statutory construction, the starting point is the language employed by Congress.  Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms."  *Tran v. Gonzales*, 447 F.3d 937, 940 (6th Cir. 2006) (quoting *Vergos v. Gregg's Enters., Inc.*, 159 F.3d 989, 990 (6th Cir. 1998)).  There is nothing in the plain language of the statute that requires an applicant to show that he was ineligible for asylum when he arrived in the United States before he can take advantage of "changed circumstances" to extend the deadline for filing an application.  The changed circumstances must "materially affect the applicant's eligibility for asylum," but it is not evident that a changed condition that strengthens an applicant's already existing claim for asylum categorically fails to have such a material effect.  In reaching our conclusion, we find persuasive a series of cases from the Ninth Circuit rejecting

the IJ's interpretation of the statute as unduly narrow. *See Singh v. Holder*, 656 F.3d 1047 (9th Cir. 2011); *Vahora v. Holder*, 641 F.3d 1038 (9th Cir. 2011); *Fakhry v. Mukasey*, 524 F.3d 1057 (9th Cir. 2008).

In *Fakhry*, a Senegalese man who had joined a democratic resistance group before fleeing to the United States applied for asylum. He did not apply within one year of arriving in the United States, even though he was afraid to return to Senegal from the moment he entered this country, and he always intended to seek asylum. *Fakhry*, 524 F.3d at 1060. Fakhry eventually applied for asylum after the U.S. government began removal proceedings against him, arguing that his opposition group was still being persecuted by the Senegalese government and that conditions had worsened. The IJ concluded that Fakhry could not assert "changed circumstances" to excuse his delay in filing for asylum because there was never a drastic change that altered Fakhry's "constant interest in remaining in the United States." *Id.* at 1061. On appeal, the court concluded "that there is no support in the statute, case law, or purposes of the statute for the IJ's holding that Fakhry did not qualify for the changed circumstances exception solely because his subjective intent to apply for asylum—and subjective fear—existed before the expiration of the one-year asylum application period." *Id.* at 1064. The court reasoned that the standard applied by the IJ was contrary to the statute because it would contradict the purpose of the changed-circumstances exception "to excuse late applications when an alien previously had a weak or nonexistent case for asylum." *Id.* at 1063.

In *Vahora*, the court elaborated on its conclusion in *Fakhry*, explaining that a rule requiring asylum applicants to show that they did not fear persecution before the purported changed circumstances would be at odds with Congress's intent in enacting the changed-circumstances exception:

> Our law does not require that 'changed circumstances' constitute an entirely new conflict in an asylum applicant's country of origin, nor does it preclude an individual who has always feared persecution from seeking asylum because the risk of that persecution increases. . . . An applicant is not required to file for asylum when his claim appears to him to be weak; rather he may wait until circumstances change and the new facts make it substantially more likely that his claim will entitle him to relief. In such cases, we may recognize changed circumstances.

*Vahora*, 641 F.3d at 1044 (internal citations omitted).  The court relied heavily on statements made by members of Congress during debate, which demonstrate that the purpose of the changed-circumstances exception is broad and encompasses most situations that would provide "good cause" for failing to apply within one year of arrival.  *Id.* at 1045.  Indeed, Senator Orrin Hatch, a major proponent of the one-year deadline, emphasized that the changed-circumstances exception would permit an applicant to apply for asylum if he "obtains *more* information about likely retribution he or she might face if the applicant returned home."  *Id.* (quoting 142 Cong. Rec. S11839–40) (emphasis added).  Notably, the applicant need not obtain information that a new threat of persecution exists after a change in circumstances; rather, he may claim the changed-circumstances exception if he obtains "more information" that strengthens his fear of persecution, a fear that may already have existed.  *See Singh*, 656 F.3d at 1053 ("[A] petitioner might still qualify for the changed circumstances exception even if the relevant circumstances do not create a new basis of persecution but simply provide *further evidence of the type of persecution already suffered*.") (emphasis added).  We find the Ninth Circuit's reasoning persuasive, and we adopt its construction of the changed-circumstances provision.

The IJ and the BIA determined that the Mandebvus' asylum applications were untimely because they provided evidence of only "incremental change"—that is, change that strengthened the fear of persecution that already existed—which they deemed categorically insufficient to demonstrate "the existence of changed circumstances which materially affect the applicant[s'] eligibility for asylum."  8 U.S.C. § 1158(a)(2)(D).  In doing so, they misconstrued the statutory language and applied an unduly narrow legal standard.  Accordingly, we grant the Mandebvus' petition with regard to their asylum claim and remand to the BIA to consider, utilizing the correct legal standard, whether the Mandebvus have demonstrated changed circumstances that materially affect their eligibility for asylum.  If the BIA determines on remand that the Mandebvus have timely filed their applications for asylum, it may then address the asylum claims on their merits and grant the applications for asylum if appropriate.

## IV.  WITHHOLDING OF REMOVAL UNDER THE INA

The Mandebvus also argue that, even if they did not timely apply for asylum, they are entitled to withholding of removal.  An alien seeking withholding of removal under the INA

must demonstrate that "it is more likely than not that his 'life or freedom would be threatened in that country [of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" *Haider*, 595 F.3d at 283 (quoting 8 U.S.C. § 1231(b)(3)(A)). Thus, the court must find both (1) that the petitioner faces abuse on account of a protected ground and (2) that the abuse rises to the level of persecution.

The IJ acknowledged that the Mandebvus were "perceived as anti-government" because they were teachers who made statements that were critical of ZANU-PF to their students. A.R. 102 (IJ Dec. at 19). However, he concluded that the Mandebvus could not show that they would be persecuted in the future on the basis of political opinion because they had not shown that they were high-level members of MDC who would be targeted by the government. First, the IJ found the Mandebvus' claims of membership in the MDC "highly questionable" because they officially joined the party only after removal proceedings had been initiated against them. *Id.* at 105 (IJ Dec. at 22). Even if they were legitimately members of the MDC, the IJ reasoned that members of the MDC were not necessarily targeted for persecution:

> If the membership in the MDC makes a person such a magnet for abuse by the government, one would have expected that the doctor [who was carrying on research critical of the government] would have been a prime candidate when he was confronted by police in 2003. At least he would have been a candidate to have his research product confiscated and destroyed, arrested for some period of time. But none of those things happened, and he was not even threatened on account of his membership in the MDC.

*Id.* at 106 (IJ Dec. at 23). The IJ ultimately concluded that, because "neither respondent in this case has ever held any sort of a leadership position or a high-profile role in the MDC either in Zimbabwe or in the United States," the evidence was not sufficient to show that it is more likely than not that they would be persecuted upon their return to Zimbabwe. *Id.* at 107 (IJ Dec. at 24). The BIA accepted the IJ's reasoning, noting that "a generalized or random possibility of persecution is generally insufficient to establish persecution." *Id.* at 4 (BIA Dec. at 2). Thus, both the IJ and the BIA denied withholding of removal because they concluded that the Mandebvus failed to show that any abuse leveled against them in the future would be *because of* political opinion.

**A. Protected Ground:  Political Opinion**

The Mandebvus argue that ZANU-PF targeted them for abuse because they were perceived as anti-government.  *See Haider*, 595 F.3d at 284 (holding that imputed political opinion is a protected ground).  The IJ found that the Mandebvus, because of their profession and their specific conduct (*e.g.*, refusing to attend ZANU-PF rallies, criticizing the government to students and fellow teachers) would be "perceived as being both political and opposition political by those in power."  *Id.* at 102 (IJ Dec. at 19).  Furthermore, the IJ explicitly acknowledged that "persons perceived as being in opposition to the government have been subjected to physical abuse by Z[ANU]-PF, by the police and by others in government.  They have been beaten.  Some have been killed."  *Id.* at 107 (IJ Dec. at 24).  Yet, the IJ concluded that the Mandebvus could not show they would likely be persecuted because of political opinion unless they manifested that opinion through affirmative conduct, namely by joining and becoming leaders of MDC.  By requiring a specific form of affirmative political conduct as proof of political opinion, the IJ erred.

A petitioner claiming protected status based on political opinion does not need to show that he took the affirmative action of joining a political party.  Rather, the petitioner needs to show only that he expressed political opinion, which may include affirmative or negative conduct:

> A political opinion can be expressed negatively as well as affirmatively. A refusal to support a cause—by staying home on election day, by refusing to take an oath of allegiance, or by refusing to step forward at an induction center— can express a political opinion as effectively as an affirmative statement or affirmative conduct.

*INS v. Elias-Zacarias*, 502 U.S. 478, 486 (1992) (Stevens, J., dissenting); *see also Yidong Bu v. Gonzales*, 490 F.3d 424, 431 (6th Cir. 2007) (holding that opposition to government corruption may constitute political opinion).  Opposition to a political party is a means of expressing political opinion as surely as is support of a different party, and either may be the basis of a claim for withholding of removal.

To be sure, it may sometimes be difficult to determine whether a petitioner's criticism of his persecutor is true political opposition or whether it is born from personal conflict.  *See Marku*

*v. Ashcroft*, 380 F.3d 982, 987 (6th Cir. 2004).  However, when there is no evident basis for personal conflict and the abusive conduct follows a confrontation charged with political meaning, the only fair inference is that the abuse was a result of political opinion.  This is especially true when the opposition conduct is "relatively public."  *Zoarab*, 524 F.3d at 782 (finding no evidence that a petitioner who called the prince of the United Arab Emirates corrupt was expressing opposition to the government, as opposed to confronting the prince over a business deal gone sour, because the petitioner did not make any public statements of political opposition).

The Mandebvus have provided overwhelming evidence that individuals who expressed opposition to ZANU-PF were targeted for abuse.  For example, Sheya's mother was riding a bus that was stopped by ZANU-PF members, who demanded that she produce a membership card showing her support for and affiliation with the party.  When she failed to produce the membership card—a demonstration that she was not affiliated with ZANU-PF—she was beaten so badly that she later died from her injuries.  The passengers who were able to produce membership cards were not beaten or otherwise abused.  The evidence in the record reveals that the ZANU-PF members who singled out Sheya's mother for physical abuse knew only one fact about her:  that she did not support their political party.  Thus, the sole conclusion that we can draw is that they beat and killed her *because of* her political opposition.  As another example, all of Sheya's brothers were targeted for abuse, even though not all of them publicly supported MDC, because they were each perceived as opposing ZANU-PF and the Mugabe government.

It is clear from the IJ's factual findings that the Mandebvus themselves made many public statements critical of ZANU-PF, even before they began to support MDC.  Both Sheya and Mtandazo expressed criticism of ZANU-PF to students and fellow teachers.  This public expression of political opposition was not without consequence.  ZANU-PF members regularly forced teachers to attend party rallies and killed or injured the teachers who refused to do so.  Indeed, Mtandazo was forced into hiding when she refused to attend a rally and was warned that ZANU-PF members were looking for her.  There can be no doubt that the teachers who refused to attend ZANU-PF's political rallies were targeted for harassment because of their political views.  On another occasion, Mtandazo's cell phone was confiscated because Youth Brigade members suspected that she was an MDC supporter and that she used the phone for MDC

business.  The IJ determined that it was "really not clear from the evidence" why the ZANU-PF members thought that Mtandazo was an organizer for the MDC, and thus the IJ appeared to discount the incident.  A.R. 103 (IJ Dec. at 20).  But it is not relevant *why* members of ZANU-PF concluded that Mtandazo had joined an opposition party; the relevant point is that they did in fact perceive her as opposed to ZANU-PF, and that they confiscated her property *because of* her perceived political affiliation.

These incidents exemplify the abuses suffered by individuals who oppose ZANU-PF: party members target not only individuals who take affirmative action by joining MDC, but also individuals, such as Sheya's mother, who take negative action by failing to support ZANU-PF. Therefore, the IJ erred by requiring the Mandebvus to demonstrate affirmative political action— specifically, conspicuous involvement in the MDC—as proof of political opinion.  It is simply not relevant that the Mandebvus never held a high-profile role in the MDC.  The proper inquiry is whether it is more likely than not that the Mandebvus will be persecuted for their conduct in opposition to ZANU-PF, including their general statements critical of the government and its policies, their failure to join ZANU-PF, and their involvement with MDC in the United States.

In addition to discounting improperly the Mandebvus' opposition conduct that did not take the form of formal support of MDC, the IJ ignored certain critical pieces of evidence that strongly indicate that the Mandebvus will be targeted by ZANU-PF.  The Mandebvus presented credible evidence that ZANU-PF members have been searching specifically *for them* since they fled Zimbabwe.  Beginning in 2000, ZANU-PF members repeatedly contacted Mtandazo's mother to ask where Mtandazo had gone and to encourage her return.  When Sheya's father returned to Zimbabwe after visiting the United States, several government agents interrogated him regarding Sheya's address and activities.  Mtandazo's father was also questioned regarding her activities and whereabouts when he returned to Zimbabwe after visiting the Mandebvus in the United States.  Only a month before the hearing in this case, Mtandazo's father told her that the government was still searching for her.  This evidence strongly shows that the Mandebvus are not subject to merely a "generalized or random possibility of persecution," s*ee* A.R. 4 (BIA Dec. at 2), but rather are the specific targets of the ZANU-PF.  This questioning appears to be part of ZANU-PF's pattern of monitoring the activities of individuals who publicly voice opposition to its policies.  The record evidence reveals only one reason that the Zimbabwean

government would want to find the Mandebvus: their perceived political opposition to the ZANU-PF party, the government, and its policies. The evidence demonstrates that, not only are the Mandebvus likely targets for persecution in a generic sense by virtue of their past political opposition, but also that they are likely targets in a very specific sense.

The immigration courts' decisions are entitled to deference only if they are "supported by reasonable, substantial, and probative evidence on the record considered *as a whole*." *Ramaj*, 466 F.3d at 527 (emphasis added) (internal quotation marks and citation omitted). Because the IJ failed to consider several critical pieces of evidence and improperly required the Mandebvus to provide certain other evidence, his decision was not supported by substantial evidence. The record evidence compels us to conclude that ZANU-PF was motivated by the Mandebvus' opposition to the government—that is, their political opinion—to target them for abuse.

## B. Future Persecution

Because we conclude that ZANU-PF will target the Mandebvus because of their political opinion, we also consider whether the abuse directed at individuals who oppose ZANU-PF rises to the level of persecution. The Mandebvus have conceded that they are not claiming past persecution, and thus they cannot rely on the presumption that they will face persecution in the future if returned to Zimbabwe. *See* 8 C.F.R. § 208.16(b)(1)(i). Therefore, the Mandebvus bear the burden of demonstrating that "it is more likely than not" that they will be targeted for persecution on the basis of a protected characteristic. *Id.* at § 208.16(b)(2).

The INA does not contain a definition of the word "persecution." *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). However, we have imbued the term with meaning in past cases: "[P]ersecution requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty. . . . [T]he types of actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Stserba v. Holder*, 646 F.3d 964, 972 (6th Cir. 2011) (internal quotation marks and citation omitted). It is evident from this list that physical "harm need not be life threatening to constitute persecution, . . . [and i]n some

cases, an applicant need not prove physical harm at all." *Haider*, 595 F.3d at 286 (internal citations omitted).

The Mandebvus have provided ample evidence that individuals who oppose ZANU-PF are subjected to persecution, not merely occasional verbal reprimands. The Mandebvus have identified many individuals who opposed ZANU-PF and consequently suffered beatings, abductions, and confiscation of their property. As we discussed above, ZANU-PF members forcibly took teachers who opposed the party to camps for "reeducation," which frequently involved beatings and killings. The Mandebvus' family members offer proof that such persecution was directed against identifiable individuals who opposed ZANU-PF: Sheya's mother was taken to a camp and beaten so severely that she later died. At least three of Sheya's brothers, Thomas, Efraim, and Enywear, were also beaten for acting as community organizers and recruiters on behalf of MDC. Another of Sheya's brothers, Onward, was threatened and placed under surveillance when the government suspected him of using his position as a university professor to criticize the government and influence students. Onward fled the country before he was subject to any physical attacks. Sheya's father was also persecuted by ZANU-PF after he opposed their policies regarding food distribution: he was relieved of his duties as head of the village and his cattle were confiscated. And ZANU-PF members confiscated property from Mtandazo because they suspected her of supporting MDC. Although not all of the Mandebvus' family members were physically harmed—some were "merely" threatened, had their activities monitored, or had valuable property taken by ZANU-PF members—as a matter of law, persecution is not limited to only physical abuses or imprisonment. *See Stserba*, 646 F.3d at 972. Nearly every individual identified by the Mandebvus as opposed to ZANU-PF has suffered at least one form of persecution.

To be sure, there is evidence that at least one supporter of MDC, Dr. Kaswoswe, was not persecuted. When Dr. Kaswoswe traveled to Zimbabwe in 2003 to conduct research with opposition leaders in the MDC, he was briefly detained by government officials for questioning, but he was not harmed. He was also permitted to keep his research material, which was highly critical of the government. But there could be any number of reasons that ZANU-PF might show restraint in its interactions with a highly educated doctoral candidate, in a position to expose their abuses to a broad global audience. That one known MDC member was not abused does not

make it improbable that the Mandebvus would be persecuted if forced to return to Zimbabwe. We do not require a petitioner to show that every single person who could claim protected status has been and will be persecuted before we will grant relief.

Furthermore, in the wake of the 2008 elections, it is even more likely that individuals opposed to ZANU-PF will be targeted for persecution. The U.S. Department of State's Country Report for Zimbabwe describes worsening conditions during the elections, as ZANU-PF struggled to retain control of the government: "The ruling party's dominant control and manipulation of the political process through violence, intimidation, and corruption effectively negated the right of citizens to change their government. Unlawful killings and politically motivated abductions increased. State-sanctioned use of excessive force increased, and security forces tortured members of the opposition, student leaders, and civil society activists with impunity." A.R. 635 (2008 Country Report at 1). Even if Dr. Kaswoswe's treatment is evidence that it was not probable in 2003 that that the Mandebvus would have been persecuted, it is not persuasive evidence that the Mandebvus will not be probable targets for persecution in light of the increased violence surrounding the 2008 elections.

Under these circumstances, we can "state with conviction" that ZANU-PF was motivated to persecute the Mandebvus because of their political opinion. *Zoarab*, 524 F.3d at 780 (quoting *Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997)). Accordingly, we grant the Mandebvus' petition with respect to their claims for withholding of removal. We remand to the BIA with instructions to grant withholding of removal if it determines that the Mandebvus are not entitled to asylum.

## V.  WITHHOLDING OF REMOVAL UNDER THE CAT

The Mandebvus also argue that they are eligible for withholding of removal under the Convention Against Torture ("CAT"). An alien qualifies for withholding of removal under the CAT if he demonstrates that "'it is more likely than not that [he] would be tortured if removed to the proposed country of removal.'" *Haider*, 595 F.3d at 289 (quoting 8 C.F.R. § 208.16(c)(2)). Torture is an extreme form of abuse, "by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . at the instigation of or with the consent or acquiescence of a public official." 8 C.F.R. § 1208.18(a)(1). During the 2008 elections, ZANU-

PF members increased their use of torture against political opponents: "[ZANU-PF] set up numerous torture camps throughout the country . . . . One NGO report stated that at least 6,300 victims of torture and assault received medical treatment during the year, nearly double the 3,463 victims recorded in 2007. Torture and other assault methods commonly reported included beating victims with sticks, whips and cables; suspension; burning; electric shock; and falanga (beating the soles of the feet)." A.R. 638–39 (2008 Country Report at 4–5). Thus, it is quite possible that the Mandebvus would be subject to torture upon their return. *See Mushayahama v. Holder*, 469 F. App'x 443, 459–60 (6th Cir. 2012) (discussing the many kinds of torture prevalent in Zimbabwe).

In spite of the Country Report documenting the deplorable conditions in Zimbabwe, neither the IJ nor the BIA discussed these conditions before summarily concluding that "the evidence does not show that it is more likely than not that either respondent . . . will be tortured for any reason if they are returned to Zimbabwe." A.R. 108 (IJ Dec. at 25). Because the decision does not indicate that the BIA considered "all evidence relevant to the possibility of future torture," and because it "might have adjudicated [the] claim differently" if it had done so, *see Mostafa v. Ashcroft*, 395 F.3d 622, 626 (6th Cir. 2005) (quotation marks and citations omitted), we remand the claim for withholding of removal under the CAT to the BIA with instructions to consider the CAT claim in light of the relevant country conditions.

## VI. CONCLUSION

For the foregoing reasons, we **GRANT** the Mandebvus' petition and **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

MERRITT, Circuit Judge, concurring.  I join Judge Moore's opinion sending this case back to the BIA for reconsideration.  In addition to the reasons she gives based on asylum, the most recent State Department Country Report for 2013 for Zimbabwe states that President Robert Mugabe was reelected on July 31, 2013, in an election that "was neither fair nor credible," using "a process effectively negating the right of citizens to choose their government." The 2013 Report describes the current situation in the country as follows:

> The most important human rights problems remained the government's targeting for torture, abuse, arrest, and harassment members of non-ZANU-PF parties and civil society activists; partisan application of the rule of law by security forces and the judiciary; the government's compulsory acquisition of private property and restrictions on civil liberties.

A 21-page Report follows this language.  It describes in detail human rights violations that run the gamut from widespread rape to widespread slavery.  This is certainly no place for the United States to send this family of five, who are non-ZANU-PF with a history of political activism.  The Report describes violations of the Convention Against Torture that this family could probably not escape.  The BIA should reconsider its former position when it took no action.  The 2013 Country Report would be a good place for the BIA to start its reconsideration.

---

**DISSENT**

---

DAVID W. McKEAGUE, Circuit Judge, dissenting.  I respectfully dissent.  Unlike the majority, I believe that we lack jurisdiction to review the Board's denial of the Mandebvus' asylum applications.  And while I do not make light of the Mandebvus' situation, I also believe, given the deferential standard of review, that the Mandebvus have failed to qualify for withholding of removal under the INA as well as relief under the CAT.

I.

First the Mandebvus contest the denial of their asylum applications.  Our jurisdiction to review untimely asylum applications like the Mandebvus' is statutorily limited.  *See* 8 U.S.C. § 1158(a)(3). We only have jurisdiction to review such applications "when the appeal seeks review of constitutional claims or matters of statutory construction, not when the question is discretionary or factual."  *Khozhaynova v. Holder*, 641 F.3d 187, 191 (6th Cir. 2011) (quoting *Shkulaku–Purballori v. Mukasey*, 514 F.3d 499, 502 (6th Cir. 2007)).  The Mandebvus argued that "changed circumstances" in Zimbabwe excused their late filing, but the IJ and the Board disagreed.  *See* 8 U.S.C. § 1158(a)(2)(D).  Notably, "'the existence of 'changed circumstances' that materially affect eligibility for asylum is a predominantly factual determination, which will invariably turn on the facts of a given case.'"  *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006) (quoting *Ramadan v. Gonzales*, 427 F.3d 1218, 1221–22 (9th Cir. 2005)).

Applying that standard here, it is clear that the IJ's "incremental change" determination is a factual finding that this court lacks jurisdiction to review.  *See Khozhaynova*, 641 F.3d at 191. The IJ did not state that an incremental change in country conditions could never constitute changed circumstances within the meaning of the statute; the IJ simply noted that "[c]hanged circumstances have to be a change in circumstance that *materially affects* the asylum eligibility of the individuals involved." A.R. at 100 (emphasis added).  This is squarely in line with the statute, which excuses late filing when an applicant can demonstrate "changed circumstances which *materially affect* the applicant's eligibility for asylum[.]"  8 U.S.C. § 1158(a)(2)(D)

(emphasis added). Assessing the facts of this case, the IJ determined that the "events following the 2000 elections, while they did result in an incremental change in the conditions in Zimbabwe, certainly, in the judgment of the Court, *are not a change that materially affects the eligibility of these two individuals for asylum*." A.R. at 100 (emphasis added). The Mandebvus' argument is not one involving an issue of statutory construction—it is a direct challenge to the IJ and Board's factual determinations that the changed conditions in Zimbabwe did not materially affect the Mandebvus' eligibility for asylum.

I do not agree with the majority that either the IJ or the Board assumed that an incremental change was categorically insufficient to support a finding of changed country conditions. The IJ considered the factual evidence presented by the Mandebvus, yet "d[id] not see that as a change in country conditions that *materially affects* the eligibility of these respondents for asylum." A.R. at 100–01 (emphasis added). Similarly, the Board examined the facts presented in the Zimbabwe Country Report and also found that the Mandebvus did not establish "a change in circumstances . . . [that justified] the delayed filing." A.R. at 4. The issue here is not whether incremental changes in a country could ever constitute changed circumstances, but whether conditions in Zimbabwe deteriorated to the point where they had a material effect on the Mandebvus' eligibility for asylum. Both the IJ and the Board found that they did not. This is a contested factual determination about the nature of ongoing violence that we are without jurisdiction to review. *See Almuhtaseb*, 453 F.3d at 748. ("Because [the applicant's] claim relies on contesting . . . factual determinations rather than on statutory construction or a constitutional claim, we are without jurisdiction to review the Board's determination denying her asylum."). I would therefore dismiss this part of their petition.

## II.

The Mandebvus next contest the IJ and Board's denial of withholding of removal under the INA. The Mandebvus bore the burden of demonstrating that it was "more likely than not" that they would be persecuted on the basis of their political opinions if they returned to Zimbabwe. *See* 8 U.S.C. § 1208.16(b)(2); *Khozhaynova*, 641 F.3d at 192–93 (discussing the clear probability standard). We review a denial of withholding of removal for substantial evidence, meaning we afford deference to the IJ and Board's decisions and must affirm unless

any reasonable adjudicator would be "*compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphasis added); *see also Stserba*, 646 F.3d at 971–72 (observing that reversal is only appropriate if the decision was manifestly contrary to law). Because I believe that substantial evidence supports the IJ and Board's findings, I would affirm.

At the onset, I disagree with the majority's characterization of the IJ's discussion of the Mandebvus' political activism. The IJ acknowledged that some individuals associated with the opposition government had been beaten or killed, but the IJ stated that "*according to both respondents*, [the Mandebvus] were perceived as being both political and opposition political by those in power." A.R. at 102 (emphasis added); *see also* Maj. Op. at 18 (discussing this statement). I would not rely on this statement as an indication that the IJ made a finding that this was in fact true, especially because the IJ's observation that the Mandebvus' membership was "highly questionable" as well as other reasoning in the decision indicates the opposite. I note that the IJ carefully considered the Mandebvus' specific conduct and reasoned, for example, that it was "really not clear from the evidence" why the ZANU-PF confiscated Mrs. Mandebvu's cell phone at a roadblock one week after she attended a political rally, and that it could be "because they knew her, because they knew she was a teacher, or simply because she was in possession of a cell phone." A.R. at 103.

While I agree with the majority that the Mandebvus presented evidence that some individuals who expressed opposition to the ZANU-PF were targeted for abuse, I cannot ignore that other individuals who expressed opposition to the ZANU-PF were not targeted for abuse. As the majority notes, Dr. Kaswoswe, a witness for the Mandebvus, was not persecuted upon his return to Zimbabwe despite the fact that he was far more politically active than the Mandebvus, carried an opposition party card, interviewed opposition party members, conducted dissertation research critical of the government, and admitted that he was a member of the opposition party. Dr. Kaswoswe's safe return to Zimbabwe, particularly in light of how he demonstrated his political opposition to the ZANU-PF more brazenly than the Mandebvus, supports the IJ's conclusion that the Mandebvus failed to show that they would "more likely than not" face persecution. It is not the only conclusion that can be derived from the evidence, but that alone does not make this conclusion unreasonable. In light of the deferential standard of review, that is enough to warrant affirmance.

The majority seems to suggest that the IJ concluded that the evidence was insufficient simply because the Mandebvus did not hold leadership positions in the opposition party. While the IJ did "note" this fact, the IJ's conclusion was clearly the product of a careful weighing of the evidence, which is made obvious by reviewing the IJ's reasoning in full:

> If the *membership* in the MDC makes a person such a magnet for abuse by the government, one would have expected that the doctor, or then doctoral candidate would have been a prime candidate when he was confronted by police in 2003. At least he would have been a candidate to have his research product confiscated and destroyed, arrested for some period of time. But none of those things happened, and *he was not even threatened on account of his membership* in the MDC.

> Now, the supporting documents in this case do show that MDC members and other persons perceived as being in opposition to the government have been subjected to physical abuse by Zanu-PF, by the police and by others in government. They have been beaten. Some have been killed. The Court would *note*, however, that neither respondent in this case has ever held any sort of a leadership position or a high-profile role in the MDC either in Zimbabwe or in the United States. And, again, the Court finds their election to suddenly become a full-fledged, card-carrying member of the MDC only after being placed in proceedings, to be suspicious to the point of being almost humorous. Certainly either or both of the respondents could be perceived as being opposed to the government in power in Zimbabwe at this time and certainly *the possibility exists* that one or both of them would be arrested, detained, beaten or even killed.

> That said, *in the judgment of the Court the evidence is not sufficient in this case to show that it is more likely than not, in other words that there is a clear probability, a 51 percent or better chance, that the life or freedom of either respondent would be threatened in Zimbabwe on account of their membership, either real or perceived, their membership in the MDC and as a consequence the perception that they are opposition, they form a part of the opposition to the government in power.*

A.R. at 106–07 (emphasis added). It is clear to me that while the IJ recognized that the *possibility* of persecution on the basis of *membership* alone existed, the IJ concluded that the evidence was insufficient to meet the "more likely than not" standard. I cannot say that the evidence *compels* a contrary conclusion, and so I would affirm.

III.

The Mandebvus lastly contest the IJ and Board's denial of withholding of removal under the CAT. In order to meet their burden, the Mandebvus "must 'establish that it is more likely

than not that [they] would be tortured if removed to the proposed country of removal.'" *Dugboe v. Holder*, 644 F.3d 462, 472 (6th Cir. 2011) (quoting 8 C.F.R. § 208.16(a)(2)). This requires the applicant to establish a "particularized threat of torture." *Castellano-Chacon v. INS*, 341 F.3d 533, 551 (6th Cir. 2003). "Torture" means:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). An act of torture "must be specifically intended to inflict severe physical or mental pain or suffering," 8 C.F.R. § 1208.18(a)(5), and "must be directed against a person in the offender's custody or physical control." *Id.* at § 1208.18(a)(6). We review the finding below for substantial evidence, *see Bonilla-Morales v. Holder*, 607 F.3d 1132, 1139–1140 (6th Cir. 2010), and must affirm unless any reasonable adjudicator would be "*compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphasis added).

The Mandebvus argue that they qualify for CAT relief because "they have relatives who have been tortured," "torture camps were set up in Zimbabwe," "[t]he government engages in torture," and the "police and security forces engage[] in torture." Accordingly, the Mandebvus allege, they are more likely than not going to be tortured. In light of the record, I cannot say that the evidence is sufficiently compelling so as to overturn the finding below. The Mandebvus have simply not established, given the substantial evidence standard of review, that it is more likely than not that they will be tortured if they return to Zimbabwe.[1] They have not personally been subject to torture in the past, and the evidence that other members of the Mandebvu family

---

[1]The majority states that the Board did not discuss the conditions discussed in the Country Report before concluding that the evidence did not show that it was more likely than not that the Mandebvus would be tortured if they returned to Zimbabwe. But the Board reasoned as follows:

> Before and after the 2008 elections, the Country Reports state that the government engaged in pervasive and systematic abuse of human rights. We further find, as did the Immigration Judge, that the respondent failed to establish either a change in circumstances in Zimbabwe or extraordinary circumstances justifying the delayed filing.

A.R. at 4 (emphasis added). In light of the fact that the Board expressly considered the Country Report, I do not agree that the Board's decision does not indicate that it considered this evidence.

have been harassed or assaulted is not sufficient to establish that the Mandebvus themselves will more likely than not be tortured. Further, we have recognized that even if a petitioner establishes that a particular group of which he or she is a member has suffered torture, that is not sufficient to show it is more likely than not that the petitioner would be subject to such treatment. *See Almuhtaseb*, 453 F.3d at 751 (statements that Israelis have tortured Palestinians in the past, even if taken at face value, did not show petitioner would be subject to torture). Accordingly, evidence that the police or security forces sometimes engage in torture, even torture of MDC members and supporters, is not enough to show that the Mandebvus will more likely than not be subject to torture. Because I cannot say that the evidence *compels* a contrary conclusion, I would affirm.

## IV.

Because I believe that we are without jurisdiction to review the denial of the Mandebvus' asylum applications, I would DISMISS that part of their petition. Further, because the Mandebvus failed to show that they will "more likely than not" face persecution or torture if they return to Zimbabwe, I would AFFIRM the decision of the BIA to deny withholding of removal under the INA and the CAT.