**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0324n.06

**Case No. 17-3949**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 29, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MARIA JUAN-PEDRO; DONY ALONZO-JUAN; ANGELA ALONZO-JUAN, | ) ) ) | |
| Petitioners-Appellants, | ) ) | ON PETITION FOR REVIEW FROM THE UNITED STATES |
| v. | ) ) | BOARD OF IMMIGRATION APPEALS |
| JEFFERSON B. SESSIONS, III, Attorney General, | ) ) ) | |
| Respondent-Appellee. | ) | O P I N I O N |

BEFORE:     COLE, Chief Judge; CLAY and THAPAR, Circuit Judges.

COLE, Chief Judge.  Maria Juan-Pedro and two of her children petition for review of an order denying their application for asylum and withholding of removal.  The United States Board of Immigration Appeals found that Juan-Pedro and her children failed to establish a nexus between a protected social group and the harm they suffered in Guatemala.  But to find this, the Board gave short shrift to declarations and other record materials that make this connection.  Because the Board's finding is not based on substantial evidence, we grant the petition for review, vacate the Board's order, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Maria Juan-Pedro and two of her children fled their small Guatemalan village for the United States after a brutal attack by an MS-13 gang. MS-13 is an international crime gang that started in Los Angeles and spread around the United States and into Central America. Its tactics are best summed up by its motto: "rape, control, kill." It carried out the first two prongs of its motto when six MS-13 members entered Juan-Pedro's home with guns. They identified themselves as MS-13 members, pointed guns at Juan-Pedro and her two children, and demanded money. While three of the men searched for money, one raped Juan-Pedro, and the two remaining men held back her children. The gang members threatened to carry out the third prong of their motto when they told Juan-Pedro that they would kill her and her children and promised to return.

Following the attack, Juan-Pedro took her children and traveled through Mexico to the United States, where they arrived four days later. They applied for asylum and withholding of removal based on race, membership in a particular social group, and under the Convention Against Torture.

The petitioners are of Mayan ancestry, and their native language is Akatek, one of more than 20 Mayan-related languages spoken in Guatemala. Though one of Juan-Pedro's children understands some Spanish, Guatemala's official language, Juan-Pedro does not. In her asylum application, she explained that in "June 2014 MS-13 broke into my home with weapons. They threatened me & my children. They said they would come back & kidnap[] the children if I didn't have more money. . . . They will kill us because we are [i]ndigenous." Administrative Record, R. 6-2, PageID 272.

Juan-Pedro and her children submitted declarations elaborating on these events, which the immigration judge admitted into evidence without objection from the government. In her

declaration, Juan Pedro explained that she was a member of the Akateko ethnic group, and that "MS 13 has targeted me and my family because they know Akate[k]o People do not go to the police. If we did go to the police they would just ignore us. The Akate[k]o people have been targeted by the government and MS 13 because of tribal land holdings in Guatemala." *Id.* at 228. On the day of the attack, Juan-Pedro was cooking when the men "knocked open the door[,] . . . grabbed the kids[,] and pointed the guns at their heads." *Id.* They demanded money from her or said they would kill her children. The children's declarations similarly mentioned that the robbers pointed guns at them and demanded money.

In addition to these materials, Juan-Pedro and her children submitted the declaration of Dr. Linda Green, an anthropology professor with a research focus on how violence affects indigenous peoples of the Americas. That declaration explained that the indigenous peoples of Guatemala "comprise the lowest class." *Id.* at 238. She noted that due to "perceptions of gender and racial inferiority of Mayan women, Guatemalan men understand that . . . there will certainly be no penalty for crimes against individual indigenous women." *Id.* at 245. And "police are unlikely to want to help an indigenous woman because they too often share the racist and sexist view that she belongs to the lowest class of citizens." *Id.* at 247. She concluded that "Mayan communities have never known justice from the Guatemalan state . . . [and] impunity, social inequality[,] and patriarchal attitudes towards . . . Mayan women in particular are root causes of the extraordinary violence against women in Guatemala." *Id.* at 248. Juan-Pedro also submitted country reports and news articles on Guatemala that discussed similar themes.

Both Juan-Pedro and the expert provided additional testimony at a hearing. Juan-Pedro testified first, and she explained the facts of the attack and why she did not report it to the police. Although she testified that she did not know the robbers and did not know why they broke into her

home on that particular day, she said they identified themselves as members of the MS-13 gang. She also explained that the nearest police station was two hours away and that the police "don't help." *Id.* at 160. Dr. Green likewise explained that the indigenous peoples in Guatemala have faced severe discrimination. As she put it, they are "at the bottom of the barrel . . . as evidenced by United Nations agencies' statistics, as well as the World Bank and the State Department." *Id.* at 178. She also described the "many layers" of gangs that target indigenous women and the ineffectiveness of law enforcement in addressing the problem.

The immigration judge denied the applications for asylum and withholding of removal. It found Juan-Pedro to be credible, that the harm Juan-Pedro and her children suffered was committed by parties that the Guatemalan government either cannot or will not control, and that Juan-Pedro and her children were members of a "particular social group" within the meaning of 8 U.S.C. §§ 1101(a)(42)(A) and 1231(b)(3)(A). But the immigration judge found that Juan-Pedro and her children had not shown a nexus between the harm they suffered and their membership in a particular social group and denied relief. As alternative bases, the immigration judge found that they had not presented a claim that rose to the level of past persecution and that they could relocate within Guatemala.

The Board affirmed. It adopted and affirmed the immigration judge's conclusion that there was no nexus between the harm suffered by Juan-Pedro and her children and their status in a particular social group. Administrative Record, R. 6-2, PageID 4. The Board assumed that Juan-Pedro's proposed social groups are cognizable for purposes of asylum and withholding of removal. Those three groups were (1) Akateko indigenous Mayans, (2) members of Juan-Pedro's nuclear family, and (3) indigenous females marginalized by society. The Board acknowledged the evidence of discrimination against indigenous Guatemalans but nevertheless concluded that

membership in a particular social group was not "one central reason for the claimed persecution." *Id.* The Board did not address the immigration judge's alternative arguments.

Juan-Pedro now appeals.

## II. ANALYSIS

The Board reviewed the immigration judge's decision and issued a separate opinion, so we review the Board's decision as the final agency determination, although we also review the immigration judge's reasoning to the extent the Board adopted it. *Harmon v. Holder*, 758 F.3d 728, 732 (6th Cir. 2014). We review questions of law de novo, but we review factual findings under the substantial-evidence standard. *Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007). We reverse under the substantial evidence standard when the evidence "not only supports a contrary conclusion, but indeed compels it." *Mandebvu v. Holder,* 755 F.3d 417, 424 (6th Cir. 2010) (quotation marks, citation, and emphasis omitted).

To be eligible for asylum and withholding of removal, an applicant must show "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42) (asylum); 1231(b)(3) (withholding of removal). For asylum, an applicant must also establish that membership in a particular social group is "at least one central reason" for the persecution. § 1158(b)(1)(B)(i). To be "at least one central reason" for the persecution, there must be a causal connection between the particular social group and the harm. *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1137 (6th Cir. 2010). To withhold removal, the Attorney General must decide that an applicant's "life or freedom would be threatened . . . because of . . . membership in a particular social group or political opinion." § 1231(b)(3)(A).

The Board's finding that membership in a particular social group was not "one central reason" for the persecution is not based on substantial evidence. The Board's analysis started and stopped with Juan-Pedro's live testimony, where she testified "that the gang members asked her about money, searched her home for money, took the money they found, left once they had the money, and threatened future harm if she did not give them more money when they returned." Administrative Record, R. 6-2, PageID 4. From this myopic view of the record, the Board concluded that the attack was "motivated solely by criminal intent, personal vendetta, or personal desires for revenge." *Id.* at 5. But the Board, repeating the same error as the immigration judge, ignored declarations and other record evidence that tied the MS-13 attack on Juan-Pedro and her children to their indigenous status. These materials "are included in the record in this case" yet "never mentioned in the Board's opinion." *Mostafa v. Ashcroft*, 395 F.3d 622, 625 (6th Cir. 2005). As a result, the Board's finding is not "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quotation marks and citation omitted).

Start with Juan-Pedro's written declaration in support of her asylum application, which the immigration judge admitted into evidence without objection. As Juan-Pedro explained, "MS 13 has targeted me and my family because they know Akate[k]o People do not go to the police . . . [because] they would just ignore us." *Id.* at 228. And she also noted that "[t]he Akate[k]o people have been targeted by the government and MS 13 because of tribal land holdings in Guatemala." *Id.* That is, she causally connects her status as a member of the Akateko people to the reason she was singled out by MS-13: she was unlikely to report the crime to the police (a hunch on MS-13's part that turned out to be correct) because the police will ignore any complaints.

To discredit the affidavit, the Board could have concluded that Juan-Pedro was "inherently unbelievable." *Trujillo Diaz v. Sessions*, 880 F.3d 244, 253 (6th Cir. 2018). Not only did the Board not make such a finding, but it adopted the immigration judge's finding that Juan-Pedro was credible. Nor did the Board find that Juan-Pedro's declaration had internal inconsistencies or was "at odds with other materials" submitted by her. *Id.* (quotation marks and citation omitted). And the government, for its part, also had the opportunity to cross examine Juan-Pedro at a hearing, but it did not test the veracity of her declaration. The Board "should have accepted as true the facts contained in the declaration." *Id.*

Juan-Pedro's declaration was consistent with her description of the events in her asylum application, which also connected the attack to her indigenous ancestry. In her application, she explained that the MS-13 gang members "said they would come back & kidnap[] the children if I didn't have more money." Administrative Record, R. 6-2, PageID 272. And the application said that "[t]hey will kill us because we are [i]ndigenous[,] we fled and didn't pay extortion money . . . ." *Id.*

The statements in Juan-Pedro's declaration and asylum application were far from the only record evidence that tied the attack to her membership in a particular social group. Dr. Green testified that due to "perceptions of gender and racial inferiority of Mayan women, Guatemalan men understand that . . . there will certainly be no penalty for crimes against individual indigenous women." *Id.* at 245. In a similar vein, Dr. Green reinforced Juan-Pedro's point that the police would not help and that it would be pointless to report the attack by noting that "police are unlikely to want to help an indigenous woman because they too often share the racist and sexist view that she belongs to the lowest class of citizens." *Id.* at 247.

Country reports and news articles submitted with the asylum applications also highlighted the mistreatment faced by indigenous Guatemalans. For instance, a 2013 Human Rights Report discussed the marginalization of indigenous communities. Other documents discussed the difficulties members of indigenous communities face in obtaining police help or legal redress for crimes. And the articles tied the lack of effective police or legal remedies to the activities carried out by gangs. Though this evidence is less specific than other evidence presented by Juan-Pedro, it corroborates rather than diminishes the nexus between the persecution and membership in a particular social group. Other courts have relied on these same types of materials to find a nexus between persecution and a protected ground. *E.g.*, *Ordonez-Quino v. Holder*, 760 F.3d 80, 89 (1st Cir. 2013).

Taken together, the evidence "compels us to conclude" that Juan-Pedro and her children were attacked for their membership in a particular social group—their indigenous ancestry. *Mandebvu*, 755 F.3d at 431. The Board's contrary finding "was unsupported by substantial evidence," and "no reasonable factfinder could fail to find the facts" as alleged by Juan-Pedro and her children on this question. *Id.*; *Mostafa*, 395 F.3d at 624.

The government's arguments in defense of the Board's opinion lack merit.[1]

---

[1] After this case was briefed, the Attorney General issued an opinion in *Matter of A-B-* that, while not relevant here, may shift the Board's treatment of some asylum claims. 27 I&N Dec. 316 (A.G. 2018). The Attorney General noted that "persecution" has three prongs: (1) "'persecution' involves an intent to target a belief or characteristic," (2) "the level of harm must be 'severe,'" and (3) "the harm or suffering must be 'inflicted . . . by persons that the government was unable or unwilling to control." *Id.* at 337. The Board and immigration judge below followed this framework. Our opinion only addresses the first prong, and we do not consider the second or third prongs. While the immigration judge concluded that the harm to Juan-Pedro and her family did not rise to the level of past persecution (the second prong), the Board did not address this issue. But the immigration judge expressly found that Juan-Pedro "ha[d] established the inability of the government . . . to intervene and protect her had she gone to the police"—the showing necessary under the third prong. Administrative Record, R. 6-2, PageID 78–79.

First, the government observes that the MS-13 members who attacked Juan-Pedro and her children were "motivated by their criminal and financial interests." Respondent's Br. 11. That is true, but the same can be said of every robbery. What the asylum statute requires is that membership in a particular social group be "one central reason"—not the only reason—for persecution. And "one central reason" why MS-13 pursued its criminal and financial interests against Juan-Pedro is her particular social group: because she is an indigenous person, they perceived her to be an attractive target as socially marginalized and unlikely to report the crime to the police or to obtain assistance from the police. Since Juan-Pedro submitted evidence that demonstrates a causal connection between her particular social group and the harm, this is not a case where the record evidence shows only criminal or financial motives for an attack. *See Bonilla-Morales*, 607 F.3d at 1137.

Second, the government argues that Juan-Pedro's evidence simply shows violence affecting large swaths of society. We agree with the government that the general existence of widespread violence does not alone give rise to an asylum claim. But the cases trotted out by the government for this proposition have no relevance here, given that Juan-Pedro and her children submitted evidence that connects the MS-13 attack to their indigenous status. While it is true that "widespread crime and violence does not itself constitute persecution on account of a protected ground," Juan-Pedro has gone further than the petitioners in those cases by demonstrating a nexus between a particular social group and the "crime and violence." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 501 (6th Cir. 2015). Or to put it another way, Juan-Pedro has pointed to more than just "[g]eneral conditions of rampant gang violence" to show that she and her children were "targeted for abuse based on [their] membership in a protected category." *Umana-Ramos v. Holder*, 724 F.3d 667, 670–71 (6th Cir. 2013) (citation omitted).

The only remaining issues, raised by Juan-Pedro in her brief, are the immigration judge's alternative findings that the attack against Juan-Pedro and her children did not rise to the level of past persecution and that they could avoid persecution by relocating to a different area in Guatemala. The Board did not address these issues, so we leave them to the Board to consider in the first instance on remand.

We agree with much of the dissent. As it puts it, appellate courts "are not made to fact-find." (And, really, who could think otherwise?) That is why we apply deferential standards of review like the substantial-evidence standard to factual issues. And our cases have described the substantial-evidence standard as requiring reversal when the record evidence "not only supports a contrary conclusion, but indeed *compels* it." *Mandebvu*, 755 F.3d at 424. As we see it, we reverse because the record supports no other conclusion than that the nexus requirement was met.

Indeed, to resolve the nexus question now is take a road already well-traveled. In *Mandebvu*, as here, we faulted the Board for failing "to consider several critical pieces of evidence" that connected an applicant's persecution to a protected ground. *Id.* at 431. Reversing under the substantial-evidence standard, as here, we found that the "record evidence compel[ed] us" to conclude that the applicant met the nexus requirement. *Id.* And, as here, we remanded the matter back to the Board to address other issues that the Board had not first considered. *Id.*

The dissent does not contest that substantial evidence is the appropriate standard, and indeed appears to reverse under that standard. It diverges from us only on whether we should give the Board yet another chance to address the nexus question. But if we reverse under the substantial-evidence standard when the record evidence "compels" a "contrary conclusion," we fail to see what is left for the Board to decide if we remand the nexus question back to it. And the

possible counterarguments that the dissent raises to Juan-Pedro's declaration should have been tested by the government when she sought to admit it into the record—not now.

The dissent also offers advice from the Supreme Court's summary reversal of two appeals from another circuit. *I.N.S. v. Orlando Ventura*, 537 U.S. 12 (2002); *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006). But, with respect, we think the dissent took the wrong lesson from those cases. The Supreme Court faulted the Ninth Circuit in both cases for reaching a question the Board itself had not addressed first—pretty much the opposite of what happened here. *Ventura*, 537 U.S. at 17; *see also Gonzales*, 547 U.S. at 185. In *Ventura*, the Ninth Circuit impermissibly addressed a "changed circumstances" issue that the Board did not consider. *Ventura*, 537 U.S. at 17. Likewise, in *Gonzales*, the Ninth Circuit changed the legal standard but failed to remand the case back to the Board to first consider whether the facts fit under the new standard. *Gonzales*, 547 U.S. at 186.

Unlike *Ventura* and *Gonzales*, the Board here expressly addressed the nexus "matter in the first instance." *Ventura*, 537 U.S. at 17. And, consistent with those decisions, our opinion does not address the issues the Board has not yet passed on: the immigration judge's alternative findings that the attack against Juan-Pedro and her children did not rise to the level of past persecution and that they could avoid persecution by relocating to a different area in Guatemala.

### III. CONCLUSION

The Board's finding that there is no nexus between Juan-Pedro's claimed persecution and her membership in a particular social group is not supported by substantial evidence. We grant the petition for review, vacate the Board's order, and remand to the Board for reconsideration consistent with this opinion.

THAPAR, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that the Board did not take the full record into account before affirming the Immigration Judge's decision to deny the Juan-Pedros' asylum application. I part ways with the majority on what to do next. While the majority believes that we should make factual and credibility determinations on a cold record with no opportunity to observe the witnesses, I believe that we should leave that task to the Immigration Judge who saw and observed the witnesses and can better opine on things like credibility. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (stating that the Board itself is an appellate body, and can remand to the Immigration Judge for "further factfinding").

MS-13 is a ruthless gang. Maria Juan-Pedro ("Juan-Pedro") and her children know this firsthand. While living in Guatemala, MS-13 members broke into their home, raped Juan-Pedro, held the children at gunpoint, and stole the family's money. The attack was horrible, and the family fled to this country and sought asylum. But to successfully seek asylum they must demonstrate, among other things, that the attack happened "on account of" their "membership in a particular social group." 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(B)(i); *see Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136–37 (6th Cir. 2010) (upholding denial of asylum because of the failure to establish the required "nexus" between the alleged persecution and membership in a particular social group). In essence, they must show that their membership in that group *caused* the attack. On this point, Juan-Pedro's testimony was less than clear. Indeed, at different times during her testimony, she either said that she did not know why MS-13 came to her house or that they came to her house for money. But at no point, despite questioning from the government and the Immigration Judge, did Juan-Pedro say that MS-13 came to her house because of her family's ethnicity. The Immigration Judge found that this testimony failed to demonstrate that anything other than greed motivated MS-13, thus falling short of the required nexus for asylum. The Board

affirmed. If Juan-Pedro only offered this testimony, the Board's (and, by incorporation, the Immigration Judge's) decision would have been reasonable.

But the record contained more than just Juan-Pedro's live testimony. As the majority points out, Juan-Pedro also submitted a pre-hearing affidavit in which she claimed that MS-13 attacked her family because of their ethnicity. The Board failed to consider this affidavit, and that is a flaw we may not overlook. *See Mostafa v. Ashcroft*, 395 F.3d 622, 625–26 (6th Cir. 2005) (holding that the Board must consider the entire record); *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004) (stating that this court may not presume that the Board considered evidence it did not mention). "Had the Board properly considered *all evidence* relevant to" MS-13's motivations, "it might have adjudicated [the] claim differently." *Mostafa*, 395 F.3d at 626 (emphasis added). Therefore, I agree that we must reverse.[1] *Id.*

I disagree, however, with the majority's decision to proceed further. The majority weighs the additional evidence itself and holds—in the first instance—that Juan-Pedro's affidavit in fact *establishes* the required nexus, despite her inconsistent statements at the hearing. If the record was so one-sided that no reasonable jurist could disagree, then the evidence would, in fact, "compel[] us" to so conclude. *See Mandebvu v. Holder,* 755 F.3d 417, 431 (6th Cir. 2014). Indeed in *Mandebvu*, the "record evidence," when considered as a whole, "reveal[ed] only *one* reason" for the petitioner's alleged persecution. *Id.* (emphasis added). But that is not this case. Here, while Juan-Pedro's pre-hearing affidavit attributed MS-13's actions to her heritage, her live testimony disclaimed any knowledge of MS-13's motivations other than greed. Thus Juan-Pedro provided

---

[1] The majority rightly acknowledges that the Attorney General's opinion in *Matter of A-B* may alter the Board's subsequent analysis of the Juan-Pedros' asylum application. 27 I. & N. Dec. 316 (A.G. 2018). The specific effect of that opinion on their application should be left for the Board to determine in the first instance.

*two* distinct reasons for MS-13's actions. While the Immigration Judge found Juan-Pedro's live testimony credible, the Immigration Judge apparently did not consider her affidavit. Maybe armed with that evidence, the Immigration Judge might reach a different outcome. Regardless, the Immigration Judge is in the best position to decide.

Only the fact-finder "can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). And since fact-finders assess credibility so often, doing so becomes their bread and butter. *See id.* Courts of review, by contrast, lack this "special competence." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 850 (2015) (Thomas, J., dissenting); *see*, *e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1474 (2017) (redistricting) (deferring to the district court because "various cues . . . are lost on an appellate court later sifting through a paper record"); *Agosto v. I.N.S.*, 436 U.S. 748, 757 (1978) (immigration) (remanding for a new hearing because "[i]t is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised" (alteration in original) (quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) (antitrust))).

As the Supreme Court has twice reminded our sister circuit, "the proper course" in cases like this one is to "remand to the agency for additional investigation or explanation," and not to "conduct a *de novo* inquiry into the matter being reviewed." *Gonzalez v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam) (quoting *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002)). The majority attempts to distinguish these precedents by pointing out that in both of these cases the Board did not consider an issue at all. By contrast, in this case, the Board considered the issue but did not take the entire record into account. This is a distinction without a difference.

Whether the Board failed to make a factual determination because they did not consider the legal issue or because they considered the issue but overlooked key evidence is of no matter. Finding facts is finding facts, regardless of the context. There is no reason to believe that a court of appeals is more capable in one situation over another. After all, in both situations, there are still facts to be found and credibility to be determined. If the Board did not consider evidence relevant to an issue, then they need to consider it on remand before we do.

The Juan-Pedros' case requires that somebody make a credibility determination and find new facts in light of the ignored affidavit, or at the very least explain the discrepancy between that affidavit and the testimony. Consequently, we should heed the Supreme Court's advice and allow the fact-finder to be the one that reconciles Juan-Pedro's pre-hearing statements with her live testimony in the first instance. *See Mostafa*, 395 F.3d at 625–26 (remanding to the Board to consider record evidence its opinion did not mention).

Appellate panels are not made to fact-find. Therefore, I respectfully dissent from the majority's decision to sidestep "the law's ordinary remand requirement." *Ventura*, 537 U.S. at 17.