RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

FRANCISCA BONILLA-MORALES,

                        *Petitioner,*

     *v.*

ERIC H. HOLDER, JR., Attorney General,

                        *Respondent.*

No. 09-3676

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A094 922 953.

Decided and Filed: June 15, 2010

Before: DAUGHTREY, GILMAN, and SUTTON, Circuit Judges.

———————————

**COUNSEL**

**ON BRIEF:** Jamie B. Naini, THE LAW OFFICES OF JAMIE B. NAINI, Bartlett, Tennessee, for Petitioner. Anthony P. Nicastro, Ernesto H. Molina, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. Francisca Bonilla-Morales, a 57-year-old native of Honduras, requests review of a decision by the Board of Immigration Appeals (BIA) that denied her application for asylum, the withholding of removal, and protection under the United Nation's Convention Against Torture (CAT). She seeks asylum based on alleged past persecution and a fear of future persecution by the MS-13 gang in Honduras. In addition, she claims that she will be tortured by her brother-in-law, a policeman in the Honduran military, if she returns to Honduras. For the reasons set forth below, we **DENY** the petition for review.

1

## I. BACKGROUND

### A. Factual background

The following facts are based on Bonilla-Morales's testimony at her hearing before an immigration judge (IJ) in November 2008. Bonilla-Morales was born in Honduras in November 1952. She has five children, one of whom currently lives with her in Memphis, Tennessee. Her other four children continue to live in Honduras. In 1973, she was widowed when members of the MS-13 gang shot and killed her husband in Honduras. According to the U.S. State Department, the gang likely originated in the 1980s and 1990s "among marginalized Mexican and Salvadoran immigrant youths living in the slums of Los Angeles, California." The MS-13 and Mara 18 gangs are the two most widely known Central American gangs.

When Bonilla-Morales was 13 years old, her unnamed brother-in-law, allegedly a policeman in the Honduran military, tried to rape her. (Bonilla-Morales's appellate brief repeatedly asserts that he was a "high-ranking" police officer in the military, but the record contains no corroboration of this assertion.) Sometime later, when Bonilla-Morales was at a grocery store, her brother-in-law allegedly sent at least two policemen to forcefully take her from the store to a house outside the city. She was held there for five days, tied up, blindfolded, and repeatedly raped.

Bonilla-Morales's brother-in-law again kidnaped and raped her in 2004. He detained her for one day, during which he hit her hand and foot so hard that they fractured, forcing her to wear a cast on her foot. Bonilla-Morales subsequently moved to another area in Honduras, but her brother-in-law was able to locate her there. He did not harm her, however, because "there were other people" there.

One of Bonilla-Morales's sons was shot by the MS-13 gang in either 2003 or 2004. He was shot six times in his right side, hospitalized for over three months, and remains under treatment because one of his lungs was damaged during the shooting. The gang members told him that they "were the ones who killed his father," and they threatened to kill everyone in his family. In mid-2008, one of Bonilla-Morales's other sons was "bumped by a car, a motorcycle" driven by a gang member.

When Bonilla-Morales was living in Honduras, members of the gang demanded money from her every month, and she testified that the members of the gang would have killed her if she had not complied. The gang also attempted to recruit her oldest grandchild, Carlos, beginning in 2006. At one point, gang members broke into Bonilla-Morales's home, pointed guns at the family members, and took Carlos with them. They told him that they would rape his sister if he did not join. Carlos was eventually able to leave the gang's control and return back home.

Bonilla-Morales testified that she entered the United States without documentation in December 2006 with three of her grandchildren, one of whom was Carlos. She decided to leave Honduras because the MS-13 gang was attempting to recruit him. When she was interviewed by U.S. border officials, she stated that although she feared the gangs in Honduras, she did not ultimately fear returning to the country.

**B.      Procedural history**

In February 2007, the government initiated removal proceedings against Bonilla-Morales. She conceded removability, but applied for asylum, the withholding of removal, and protection under the CAT. The IJ held a merits hearing on November 21, 2008, where Bonilla-Morales and three of her grandchildren testified. That same day, the IJ issued an oral decision denying all relief. The IJ first found that Bonilla-Morales lacked credibility because (1) she never told the border officials about any mistreatment by her brother-in-law, and told them that she was not afraid to return to Honduras; (2) she claimed that her husband was killed in 1973 by a gang that did not even exist until the 1980s or 1990s; and (3) her testimony was inconsistent regarding dates of the mistreatment allegedly suffered by her and her family.

Nonetheless, the IJ alternatively found that even if Bonilla-Morales's testimony were credible, her claims were without merit. The IJ first found that she had not established eligibility for asylum because the alleged harm suffered by her and her family in Honduras was not on account of any protected ground. Next, the IJ concluded that Bonilla-Morales did not qualify for protection under the CAT because she presented no evidence that the government was willfully blind to the criminal conduct of her brother-in-law.

In May 2009, the BIA dismissed Bonilla-Morales's appeal with regard to her claims for asylum and the withholding of removal, reasoning that even if Bonilla-Morales were credible, she had not established a nexus between her alleged persecution in Honduras and one of the five protected grounds under the Immigration and Nationality Act (INA). The BIA also found that "the record does not indicate that it is more likely than not that [Bonilla-Morales] will face torture . . . upon return to Honduras," and it thus denied her CAT claim. Bonilla-Morales has timely appealed.

## II. ANALYSIS

### A.      Standard of review

We review the factual determinations of the IJ and the BIA under the "substantial evidence test." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). Under this standard, we will not reverse a factual determination unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original). Because the BIA analyzed Bonilla-Morales's claims on the assumption that her testimony was credible, we will do so as well.

### B.      Asylum

An alien who seeks asylum must establish that she meets the definition of a "refugee," which means a person who is unable or unwilling to return to her home country because of past persecution or a "well-founded fear" of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42), 8 U.S.C. § 1101(a)(42). The burden of proof is on Bonilla-Morales to establish that she meets this definition of a refugee. *See* INA § 208(b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i).

In addition, because Bonilla-Morales filed her application for asylum after May 2005, the requirements of the REAL ID Act of 2005 apply. *See* Pub. L. No. 109-13 (codified as amended at INA § 208 (b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i)). This means that Bonilla-Morales must show that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting" her. *Id*.

Bonilla-Morales claims asylum based on past persecution by the MS-13 gang that she allegedly suffered because she was a member of the putative social group of "family members of youth who have been subjected to recruitment efforts by the gang and who have rejected membership." She also claims to possess a well-founded fear that she will suffer future persecution on the same basis if she were to return to Honduras. (Bonilla-Morales's CAT claim based on the alleged kidnapings, rapes, and beating by her brother-in-law is not part of her claims for asylum and the withholding of removal.)

Bonilla-Morales faces several hurdles in establishing that she is a refugee. First, there is the question of whether the mistreatment that she allegedly suffered constitutes persecution. Persecution is defined as "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim." *Al-Ghorbani v. Holder*, 585 F.3d 980, 997 (6th Cir. 2009) (citation omitted). Neither party has presented significant evidence regarding whether the Honduran government is unwilling or unable to control the MS-13 gang.

And the mistreatment that Bonilla-Morales allegedly suffered might not be severe enough to constitute persecution. *See Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998) (explaining that persecution entails "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty"). Her family members were the primary targets of the gang, and persecution of an applicant's family members will not necessarily be determinative of past persecution of the applicant. *See Bal v. Gonzales*, 207 F. App'x 627, 630 (6th Cir. 2006) (holding that the BIA did not abuse its discretion by denying an applicant's motion to reconsider his asylum claim based on evidence of persecution suffered by the applicant's uncle). The only mistreatment that Bonilla-Morales herself directly suffered was being asked by the gang for money and having the gang break into her home on one occasion to remove her grandson Carlos, and she did not explain how this mistreatment was severe enough to constitute persecution.

Next, Bonilla-Morales must establish that the family members of youth who have been subjected to recruitment efforts by the MS-13 gang and who have rejected such membership are a cognizable social group. A social group is a group "of individuals who

share a common, immutable characteristic." *Castellano-Chacon v. INS*, 341 F.3d 533, 546 (6th Cir. 2003) (citation and internal quotation marks omitted). An alleged social group must be both particular and socially visible:

> The essence of the particularity requirement . . . is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons. Social visibility, on the other hand, requires that the shared characteristic of the group should generally be recognizable by others in the community.

*Al-Ghorbani*, 585 F.3d at 994 (citation and internal quotation marks omitted). Bonilla-Morales's proposed social group likely does not meet these requirements. *See, e.g.*, *Matter of S-E-G-*, 24 I. & N. Dec. 579, 583 (BIA 2008) (holding that neither Salvadoran youths who have resisted gang-recruitment efforts nor their families constitute social groups for asylum purposes because they lack both the particularity and social visibility characteristics).

We need not reach these two issues, however, because Bonilla-Morales's asylum claim clearly fails on the nexus requirement. That is, she has not shown that the mistreatment that she and her family suffered was "on account of" her membership in this purported social group. The MS-13 gang did not begin its attempt to recruit Carlos until approximately 2006. But much of the mistreatment that Bonilla-Morales and her family suffered at the hands of the gang happened *before* 2006. Her husband was shot and killed by alleged gang members in 1973— well before Carlos was even born. And one of her sons was shot by the same gang in either 2003 or 2004. These incidents were clearly not caused by Carlos's refusal to join the gang and thus do not support Bonilla-Morales's claim for asylum. *See, e.g.*, *Amouri v. Holder*, 572 F.3d 29, 33 (1st Cir. 2009) (explaining that to meet the nexus requirement for asylum, "an alien must produce convincing evidence of a *causal connection*; that is, convincing evidence that the harm was premised on a statutorily protected ground" (emphasis added)).

The timeline for her other alleged mistreatment is unclear. For example, Bonilla-Morales did not say when the gang began demanding money from her each month. She did, however, testify that the gang asked her for money because they knew that she had a daughter living in the United States and assumed that the daughter was sending her mother money. Because Bonilla-Morales provided no information as to when these demands

occurred, and because she stated that the gang sought money due to her daughter's presence in the United States rather than as a result of Carlos's refusal to join the gang, the demands do not support her claim for asylum. *See Marku v. Ashcroft*, 380 F.3d 982, 987-88 (6th Cir. 2004) (holding that the alien did not qualify for asylum, in part, because she failed to show that the alleged persecutor was motivated to harm her on the basis of a protected ground).

The two instances of alleged mistreatment that do coincide with or post-date Carlos's recruitment are (1) the gang breaking into Bonilla-Morales's home and forcefully taking Carlos with them, and (2) a gang member "bumping" one of her sons with a car or motorcycle. But these two incidents were far from the start of her troubles with the gang. Rather, it appears that Bonilla-Morales and her family were subject to indiscriminate violence by the gang both before and after Carlos was unsuccessfully recruited. *See Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1151 (9th Cir. 2010) ("Asylum is not available to victims of indiscriminate violence, unless they are singled out on account of a protected ground.").

And Bonilla-Morales has not shown that her mistreatment by the gang after Carlos refused membership was different in severity or nature than the mistreatment that she suffered before the gang attempted to recruit him. Indeed, the incidents that predate Carlos's recruitment appear to be more severe than those that occurred after he refused to join the gang. In short, the mistreatment that Bonilla-Morales and her family suffered was not "on account of" Carlos's refusal to join the gang—i.e., on account of her membership in the alleged social group of family members of youth who have rejected gang membership. She has therefore not established that she qualifies for asylum based on her membership in a particular social group.

Similarly, Bonilla-Morales has not shown that she is entitled to a presumption of a well-founded fear of future persecution by the gang based on her status as a refugee because she has not demonstrated past persecution on that basis. *See Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (rejecting an asylum claim based on the applicant's failure to show past persecution). Nor has she presented any evidence to show that the gang would target her upon her return to Honduras or that, if they did, it would be because Carlos rebuffed their

recruitment efforts. Bonilla-Morales's daughter who has remained in Honduras did submit a letter to the IJ stating that she and her family were forced to move to another area of Honduras because the gangs were targeting them. But Bonilla-Morales's three sons in Honduras have apparently not needed to move, and the record is devoid of any evidence that her sons have suffered any mistreatment by the gang since Bonilla-Morales left the country. *See Jing Hu v. Holder*, 342 F. App'x 94, 99-100 (6th Cir. 2009) (holding that the applicant had not established a well-founded fear of future persecution, in part, because she provided no evidence that family members remaining in the country were still being persecuted). Substantial evidence therefore supports the conclusion that Bonilla-Morales has not carried her burden to show that she is eligible for asylum based on a well-founded fear of future persecution.

## C.      Withholding of removal

In order to qualify for the withholding of removal, Bonilla-Morales must show "that it is more likely than not that . . . she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal." 8 C.F.R. § 1208.16(b)(2). This standard is more demanding than the standard required to establish asylum. *Sarr v. Gonzales*, 485 F.3d 354, 362 (6th Cir. 2007). Because Bonilla-Morales did not meet the burden of showing future persecution for asylum purposes, she cannot meet the higher burden needed to qualify for the withholding of removal. *See id.* (rejecting a claim for the withholding of removal because the applicant did not meet the more lenient standard for asylum).

## D.      CAT Protection

An alien is eligible for the withholding of removal pursuant to the CAT if she establishes that "it is more likely than not that . . . she would be tortured if removed to" her home country. 8 C.F.R. § 1208.16(c)(2). Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id*. § 1208.18(a)(1).

Bonilla-Morales claims that she will be tortured by her brother-in-law, a policeman in the Honduran military, if she were to return to Honduras. But even assuming that her brother-in-law is a public official for the purposes of the CAT (Bonilla-Morales provided minimal information about his actual position) or that he was acting in an official capacity when he harmed her, her CAT claim still fails because she has not carried her burden to show that he will more likely than not torture her if she returns. Bonilla-Morales testified regarding three alleged instances of mistreatment by her brother-in-law: an attempted rape when she was 13, her kidnaping and rape for five days sometime later, and her rape and beating for one day in 2004. Although the latter two incidents are severe enough to constitute torture, they are not by themselves sufficient to establish that it is more likely than not that she will be tortured upon returning to Honduras given the significant time span over which these incidents occurred. *See Prasla v. Gonzales*, 226 F. App'x 388, 390 (5th Cir. 2007) (holding that the applicant did not qualify for protection under the CAT, in part, because the two prior instances of mistreatment happened six years apart, which was a "long time span between the incidents"); *Lam v. U.S. Attorney Gen.*, 199 F. App'x 801, 802 (11th Cir. 2006) (holding that two instances of past beatings were not sufficient to support a CAT claim because the harm was not severe enough and because they were "isolated incidents during an extended period of time").

Moreover, the last time that Bonilla-Morales interacted with her brother-in-law (after she had moved to a different area in Honduras), he did not harm her. Although she said this was because other people were around at the time, she did not claim that he even *attempted* to harm her or that he communicated any threats to her. Three incidents over a 40-year time period, combined with the fact that he did not harm her once she moved, suggest that the IJ's and the BIA's findings were supported by substantial evidence. *See* 8 C.F.R. § 208.16(c)(3)(ii) (listing "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured" as one of the factors a court should analyze when deciding whether a CAT applicant has carried her burden).

Aside from the past mistreatment that she allegedly suffered, Bonilla-Morales has little support for her CAT claim. Particularly troubling is that Bonilla-Morales made no attempt to establish that her brother-in-law is still a policeman in the Honduran military or is even still alive (a legitimate question considering that he first attacked her 45 years ago).

 Nor did she present any evidence that he has communicated any threats against her to her or her family members, many of whom remain in Honduras.  She never even identified him by name.

Bonilla-Morales also failed to mention to the border officials the mistreatment that she allegedly suffered due to her brother-in-law.  In fact, she told them that she had no fear of returning to Honduras.  The record thus does not compel reversal of the IJ's and the BIA's conclusion that Bonilla-Morales failed to prove that she would more likely than not be tortured upon returning to Honduras.

### III.  CONCLUSION

For all of the reasons set forth above, we **DENY** Bonilla-Morales's petition for review.