**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0591n.06

No. 18-3254

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 27, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TELESFORO DIAZ-GONZALEZ, | ) | |
| | ) | |
| **Petitioner,** | ) | ON PETITION FOR REVIEW OF |
| | ) | AN ORDER OF THE BOARD OF |
| v. | ) | IMMIGRATION APPEALS |
| | ) | |
| MATTHEW G. WHITAKER, Acting | ) | |
| Attorney General, | ) | **OPINION** |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**Before: MOORE, GIBBONS, and COOK Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** Petitioner Telesforo Diaz-Gonzalez petitions for review of the Board of Immigration Appeals' ("BIA") denial of his applications for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and protection under the Convention Against Torture ("CAT"). Because he has not provided sufficient evidence to establish that "land owners who resist gangs" is a socially visible group in Guatemalan society, his asylum and withholding of removal claims fail. His CAT claim also fails because he has not demonstrated that, if he were to return to Guatemala, it is more likely than not that he would be tortured. Accordingly, we **DENY** his petition for review.

**I. BACKGROUND**

Telesforo Diaz-Gonzalez ("Diaz") is a 28-year-old native and citizen of Guatemala. He entered the United States in November 2015 and was apprehended by a Border Patrol Agent. *See*

A.R. at 384 (Border Patrol Report). Diaz admitted to entering the United States without permission and was issued a Notice and Order of Expedited Removal. A.R. at 388–91 (R. of Sworn Statement); A.R. at 487 (Notice and Order of Expedited Removal). On January 6, 2016, the U.S. Department of Homeland Security filed a Notice to Appear ("NTA") in Immigration Court, initiating removal proceedings against Diaz. A.R. at 476–77 (Notice to Appear). The NTA charged Diaz with inadmissibility due to his status as an immigrant without valid, unexpired immigration, travel, or identity documents, under 8 U.S.C. § 1182(a)(7)(A)(i)(I). *Id*.

On February 11, 2016, Diaz appeared without counsel before an Immigration Judge ("IJ"). He admitted all factual allegations in the NTA and was determined removable. A.R. at 122–23 (Feb. 11, 2016 Hr'g Tr.); A.R. at 151 (Merits Hr'g Tr.). Diaz filed an Application for Asylum and Withholding of Removal in March 2016, but it only sought relief under CAT, 8 C.F.R. § 1208.16(c). A.R. at 456 (Appl. for Asylum and for Withholding of Removal). In June 2017, Diaz filed an amended Application for Asylum and Withholding of Removal under 8 U.S.C. §§ 1158 and 1231(b)(3). A.R. at 216–28 (Am. Appl. for Asylum and for Withholding of Removal). This application sought asylum and withholding of removal due to persecution based on race, religion, and membership in a particular group. A.R. at 220 (Am. Appl. for Asylum and for Withholding of Removal). He also submitted various supporting documents including country conditions reports and affidavits of his father, two friends, and two pastors. A.R. at 236–38, 342–60, 266–374 (Submitted Documents). Diaz's pre-hearing brief claimed persecution based on his membership in two particular social groups: "land owners who have resisted gang members" and "Christians morally opposed to gang activity." A.R. at 263 (Resp't Pretrial Br.).

On June 19, 2017, a hearing before an IJ was held on the merits of Diaz's applications for asylum, withholding of removal under the INA, and protection under the CAT. *See* A.R. at 149–204 (Merits Hr'g Tr.). Diaz testified at length about his history and fears. He testified that he was born and grew up in Sochel, Guatemala, where he lived with his parents and worked on their farm. A.R. at 160–62 (Merits Hr'g Tr.). His native language is Mam. A.R. at 180 (Merits Hr'g Tr.). On October 3, 2008, Diaz and his father were approached by members of the Maras gang, who asked them to grow marijuana on their family farm rather than its usual crops. A.R. at 163–64 (Merits Hr'g Tr.). They also asked Diaz to join their gang. *Id.* Diaz refused to grow marijuana on the farm or to join the gang because of his Christian religious beliefs. A.R. at 164 (Merits Hr'g Tr.). The gang members reacted negatively to this response and told him that he had one day to change his mind. *Id.*

The following day, as Diaz walked to church, the Maras again came upon him, told him the deadline had passed, and demanded an answer from him. A.R. at 165 (Merits Hr'g Tr.). Again, he refused to grow marijuana on the farm or to join their gang. *Id.* The Maras responded by insulting and assaulting Diaz, punching him, throwing him against the ground, and striking him in the face. A.R. at 166 (Merits Hr'g Tr.). The assault injured Diaz's arm and caused him to lose consciousness for about half an hour. A.R. at 167 (Merits Hr'g Tr.). Diaz claims that he feared for his life during the attack. *Id.* Upon regaining consciousness, Diaz immediately returned to his home, packed up, and left Guatemala for Mexico. A.R. at 168–69 (Merits Hr'g Tr.). The Mexican border was around a two-hour walk from where Diaz resided in Guatemala. A.R. at 169 (Merits Hr'g Tr.).

Diaz's father went to the police to report the assault on his son. A.R. at 170 (Merits Hr'g Tr.). The police initially told his father that they would look for and detain the assailants, but Diaz testified that they did nothing. *Id.* Diaz believes that the police take bribes from the Maras and "prefer to work with the Maras." *Id.* His family continued to live on their farm but received repeated visits from Maras members who came looking for Diaz and also threatened Diaz's parents, saying that they would be assassinated if they did not help the gang. A.R. at 170, 181 (Merits Hr'g Tr.). In 2012, Diaz's parents abandoned the farm due to the Maras' repeated visits. A.R. at 181 (Merits Hr'g Tr.). Diaz's father reports that since Diaz's parents left, the Maras have taken over the farm and now grow marijuana on the land although it still legally belongs to Diaz's family. A.R. at 171 (Merits Hr'g Tr.). Diaz testified that his father told him that after his parents moved, the Maras traveled to their new home, two hours by foot from the old farm, and continue to ask "constantly" about Diaz's whereabouts. A.R. at 176–77, 179 (Merits Hr'g Tr.). However, the affidavit that Diaz's father provided for the hearing did not mention the frequency with which the Maras continue to visit his home. A.R. at 278–83 (Carmelino Diaz Vásquez Aff. and Translation); A.R. at 192–93 (Merits Hr'g Tr.). Diaz testified that this might be explained by the fact that his father is illiterate and had to create the affidavit with the help of a notary. A.R. at 193 (Merits Hr'g Tr.).

Diaz remained in Mexico until 2013, when he returned to Guatemala because his parents informed him that there was no longer a problem there and because he had been the victim of violence and robbery in Mexico. A.R. at 176–77 (Merits Hr'g Tr.). Upon his return to Guatemala, Diaz remained hidden in his parents' home for two years because his father told him not to leave

4

due to the threat of violence. A.R. at 178 (Merits Hr'g Tr.). The Maras came looking for him at his parents' home while he was back in Guatemala, but his father told them that there was no one home and did not permit them to enter; the Maras believed his father and left. A.R. at 178, 190 (Merits Hr'g Tr.). Diaz felt that it would be useless to move to another location within Guatemala because Maras gang members were all over the country and that the police would not adequately protect him because they are being "blackmailed by the Maras." A.R. at 178–79 (Merits Hr'g Tr.). Diaz testified that he left for the United States in 2015 because he feared that he would be killed by these gang members. A.R. at 178 (Merits Hr'g Tr.). He further testified that he fears that he would be killed if he returned to Guatemala because he refuses to join them. A.R. at 179–80 (Merits Hr'g Tr.). At the end of the hearing, Diaz's counsel advanced arguments based solely on Diaz's membership in a group composed of "Guatemalan land owners who refuse to cooperate with M.S. 13 [i.e. Maras gang]." A.R. at 196 (Merits Hr'g Tr.).

Although the IJ found Diaz "essentially credible," she issued a final oral decision denying all relief at the conclusion of the hearing. A.R. at 87, 97 (IJ's Oral Decision). The IJ denied asylum and withholding of removal for five reasons: (1) Diaz had not established past persecution because he had not proved that the beating had been sufficiently severe or that the threats had been sufficiently pervasive, (2) Diaz failed to establish that the Guatemalan government was unwilling or unable to control the gang members, either in the past or in the future, (3) Diaz had not shown an objectively reasonable fear of future persecution, (4) Diaz failed to establish a nexus between his mistreatment by the gang and any of his claimed protected grounds, and (5) Diaz had not established that he could not relocate in Guatemala without harm. A.R. at 88–95 (IJ's Oral

Decision). Regarding the fourth ground for denial, the IJ found that the gang had threatened and beaten Diaz not because he was a land owner, but because he had refused to join them and grow their marijuana. A.R. at 94 (IJ's Oral Decision). The IJ found that this treatment was not particularized to Diaz's proposed group, but rather that any Guatemalan citizen who refused to comply with the gang's demands would be treated similarly. A.R. at 94 (IJ's Oral Decision). The IJ also found that Diaz's evidence had not sufficiently established a threat of torture and denied his CAT application. A.R. at 96 (IJ's Oral Decision).

Diaz appealed the IJ's decision to the BIA. A.R. at 67 (Notice of Appeal from IJ's Decision). On appeal he argued that he was persecuted due to his membership in the social group of "landowners who resist gangs." A.R. at 15–50 (Pet'r BIA Brief). On February 23, 2018, the BIA dismissed the appeal. A.R. at 3–4 (BIA Decision). The BIA determined that Diaz had not "cite[d] evidence of record that supports his assertion that [his proposed group] is socially visible in Guatemala [sic] society," and found Diaz had not sufficiently demonstrated a nexus between "membership in the proposed group" and "the gangs [sic] treatment of the respondent." A.R. at 4 (BIA Decision). The BIA also noted that on appeal Diaz had alternatively described his proposed group as "Guatemalan former land owners who are targeted by criminal organizations, in this case a known gang, because they refuse to pay the gangs, they report the gangs to the police, thus taking legal action against the gangs, and who have been persecuted in Guatemala," and took issue with his presentation of this description to the Board when he had not "clearly delineate[d]" it as such before the IJ. *Id*. Finally, the BIA held that the supporting documents that Diaz had presented

were "not sufficient to meet the respondent's burden of proof to show a likelihood of torture." *Id*. Diaz filed a timely petition for review with this court.

## II. DISCUSSION

### A. Standard of Review

We review the agency's factual determinations for substantial evidence. *Marikasi v. Lynch*, 840 F.3d 281, 286 (6th Cir. 2016). All administrative "findings of fact . . . are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id*. at 287 (quoting *Liti v. Gonzales*, 411 F.3d 631, 636 (6th Cir. 2005)). We review questions of law de novo. *Id*. at 286. However, "we give substantial deference to the BIA's interpretation of the INA and accompanying regulations." *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015). We consider the BIA's decisions to be "final agency decisions for the purposes of judicial review" and we may "review the IJ's opinion to the extent that the BIA adopts that opinion." *Marikasi*, 840 F.3d at 286–87 (quoting *Gaye v. Lynch*, 788 F.3d 519, 526 (6th Cir. 2015)).

### B. Asylum

The INA gives the Attorney General "discretion to grant asylum to applicants who meet the definition of a 'refugee.'" *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). The asylum applicant bears the burden of showing that he is a refugee. *See Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010). A "refugee" is defined as "a person who is unable or unwilling to return to [his] home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id*. (quoting 8 U.S.C. § 1101(a)(42)). The REAL ID Act also applies

to asylum applications filed after May 2005, requiring that an asylum applicant demonstrate "that his membership in a particular social group 'was or will be at least one central reason for persecuting' him." *Umaña-Ramos*, 724 F.3d at 671 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

"This court has held that a 'particular social group' is a group of individuals who share a common, immutable characteristic that is one that members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences."[1] *Marikasi*, 840 F.3d at 290. The proposed social group in which the applicant claims membership "must be both particular and socially visible." *Bonilla-Morales*, 607 F.3d at 1137. For a group to be considered socially visible or distinct, "the set of individuals with the shared characteristic [must] be perceived as a group by society.'"[2] *Umaña-Ramos*, 724 F.3d at 671 (quoting *In re S–E–G–*, 24 I. & N. Dec. 578, 586 (BIA 2008)). *Bonilla-Morales*, 607 F.3d at 1137. Finally, "the group cannot be defined exclusively by the fact that its members have been subject to harm." *Kante v. Holder*, 634 F.3d 321, 327 (6th Cir. 2011) (internal quotation and citations omitted). The asylum applicant may demonstrate that his proposed group is particular and socially visible or distinct by providing "[e]vidence such as country conditions reports, expert

---

[1]In *Matter of Acosta*, a key BIA decision discussing the requirements of cognizable "particular social group[s]," the BIA cited "a shared past experience such as former . . . land ownership" as an example of something that "might be" a "common, immutable characteristic." 19 I. & N. Dec. 211, 233 (BIA 1985). However, the opinion went on to note that "[t]he particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis." *Id*. Even if past land ownership is a qualifying immutable characteristic, proposed social groups based on that characteristic still must satisfy the other requirements enumerated here. *Matter of M–E–V–G*, 26 I. & N. Dec. 227, 239 (BIA 2014).

[2]In *M–E–V–G*, the BIA renamed the "social visibility" requirement "social distinction" so as to clarify that it did not mean ocular recognition. 26 I. & N. Dec. at 236. We use both terms interchangeably to indicate adoption of the new term and continuity with our past decisions.

witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like." *Matter of M–E–V–G*, 26 I. & N. Dec. 227, 244 (BIA 2014).

Diaz argues that he was a member of his proposed particular social group: "land owners who resist gangs."[3] Pet'r Br. at 22. We conclude that Diaz has not presented sufficient evidence to establish that this proposed group is socially visible or distinct to support a cognizable asylum claim under the INA. Diaz has not shown that "land owners who resist gangs" are "perceived as a group by society."[4] *Umaña-Ramos*, 724 F.3d at 671 (quoting *In re S–E–G–*, 24 I. & N. at 586); *see also M–E–V–G*, 26 I. & N. Dec. at 236. The country reports, articles, and affidavits that he presents contain nothing to support the conclusion that the proposed group is particular or socially distinct.

Diaz argues that in a poor nation like Guatemala, land ownership is a distinctive characteristic and the income that land ownership generates further distinguishes members of the group. Pet'r Br. at 25–26. He argues that because Guatemalan "society is based on closely knit families . . . people know one another's business" and therefore are aware of who is a member of his proposed group. Pet'r Br. at 26. Indeed, in *Matter of M–E–V–G*, the BIA noted that "in an

---

[3]In reality, Diaz's father, not Diaz himself, owned the land in question. However, the IJ and implicitly the BIA proceeded on an imputed land ownership theory, and we do the same. *See* A.R. at 289–296 (Deed); A.R. at 93–94 (IJ's Oral Decision).

[4]The BIA noted that Diaz proposed a different particular social group before it than the one he had advanced before the IJ. A.R. at 4 (BIA Decision). Diaz argues that the proposed group that the BIA considered new ("Guatemalan former land owners, who are targeted by criminal organizations, in this case a known gang, because they refuse to pay the gangs, they report the gangs to the police, thus taking legal action against the gangs, and who have been persecuted in Guatemala") was only a "more exact, developed, and clarified" version of the group he had proposed before the IJ. Pet'r Br. at 39. Diaz argues that the BIA erred by refusing to "address a proposed group not advanced before the [IJ]." Pet'r Br. at 33. Even if this "more exact" version were properly before us, Diaz still fails to show that its members would be perceived as a socially distinct group in Guatemalan society.

underdeveloped, oligarchical society, 'landowners' may be a sufficiently discrete class to meet the criterion of particularity, and the society may view landowners as a discrete group, sufficient to meet the social distinction test." 26 I. & N. Dec. at 241. Diaz, however, has not offered record evidence that this is the case in Guatemala. The fact that his proposed group is not merely landowners, but rather "landowners who resist the gangs" further complicates matters. Even if we were to assume that in Guatemala landowners are a particular and discrete group, he has not demonstrated that "landowners who resist gangs" are.

We note that Diaz's proposed social group is a composite of other groups that have been rejected in the past as insufficiently particular or socially visible: those who resist gang recruitment and those who are perceived as wealthy. In *Matter of S–E–G–*, the BIA rejected a proposed group of "Salvadoran youth who have been subjected to recruitment efforts by MS-13 and who have rejected or resisted membership in the gang . . ." 24 I. & N. Dec. at 581, 588; *see also Bonilla-Morales*, 607 F.3d at 1136 (observing that "family members of youth who have been subjected to recruitment efforts by the [MS–13] gang and who have rejected membership" likely was not a qualifying particular social group). In *Sanchez-Robles*, we affirmed the BIA's determination that a proposed social group composed of "persons who are perceived to have money or access to money due to having spent a significant amount of time in and having familial ties to the United States" did not qualify under the INA. 808 F.3d at 692; *see also Diaz-Hernandez v. Holder*, 635 F. App'x 159, 161 (6th Cir. 2015); *Palokaj v. Holder*, 510 F. App'x 464, 468 (6th Cir. 2013) (holding that "perceived wealth" is not a cognizable social group); *In re A–M–E & J–G–U*, 24 I. & N. Dec. 69, 73–76 (BIA 2007) (rejecting a social group of "wealthy Guatemalans"). We determine whether

or not a social group is cognizable under the INA "on a case-by-case basis." *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985). But Diaz has not presented evidence demonstrating how the analysis of the proposed group in his case should differ meaningfully from that of the proposed groups of these past unsuccessful petitioners.

Diaz's failure to demonstrate that his proposed social group is socially distinct is linked to his inability to prove another element of his asylum claim: nexus. He has not established that he was targeted "on account of" his membership in the group of "landowners who resist gangs." 8 U.S.C. § 1101(a)(42). The country reports and articles that Diaz presents document widespread gang violence and extortion in Guatemala and Central America more generally. *See, e.g.,* A.R. at 332–54 (Congressional Research Service, Gangs in Central America); A.R. at 361–62 (InSight Crime, Guatemala); A.R. at 370–73 (InSight Crime, Maras in Guatemala Increasing in Sophistication). However, they do not distinguish landowners or landowners who resist gangs as preferred targets of the Maras. Rather, they provide evidence that the Maras target anyone who refuses to comply with their demands and attempt to acquire resources fairly indiscriminately from members of Guatemalan society. Evidence of such widespread violence and extortion alone is insufficient to prove nexus. *See S–E–G–*, 24 I. & N. Dec. at 588–89; *see also M–E–V–G*, 26 I. & N. Dec. at 250–51 ("The gangs may target one segment of the population for recruitment, another for extortion . . . . Although certain segments of a population may be more susceptible to one type of criminal activity than another, the residents all generally suffer from the gang's criminal efforts to sustain its enterprise in the area."). Diaz himself admits that "[t]he gangs have the inclination to commit violence in order to make people acquiesce to their wishes, be it the demand to join

their ranks or asking them for money." Pet'r. Br. at 26. He fails to demonstrate sufficiently a nexus between his membership in his proposed group and his mistreatment by the Maras.

Because we conclude that Diaz has established neither membership in a particular social group nor nexus, we need not decide whether the Maras' conduct was severe enough or whether Diaz has sufficiently established that the Guatemalan government "is unwilling or unable to control" to constitute persecution under our law. *See Bonilla-Morales*, 607 F.3d at 1136–37 (quoting *Al-Ghorbani v. Holder*, 585 F.3d 980, 997 (6th Cir. 2009)) (describing additional "hurdles" in "establishing that [the applicant was] a refugee").

## C. Withholding of Removal

"[A]n applicant seeking withholding of removal faces 'a more stringent burden that what is required on a claim for asylum.'" *Urbina-Mejia v. Holder*, 597 F.3d 360, 365 (6th Cir. 2010) (quoting *Liti*, 411 F.3d at 640). To qualify for withholding of removal, the applicant must demonstrate "a clear probability that he will be subject to persecution if forced to return to the country of removal." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004). This means "that 'it is more likely than not' that he . . . will be persecuted upon return." *Liti*, 411 F.3d at 641 (quoting 8 C.F.R. § 1208.16(b)(2)). The applicant must also show that such future persecution will be "on account of race, religion, nationality, membership in a particular social group, or political opinion." *Pilica*, 388 F.3d at 955 (quoting 8 C.F.R. § 208.16(b)).

In order to qualify for withholding of removal, Diaz must make the same successful showing that he is a member of a particular social group as is required in the asylum context. Because he fails to do so in the asylum context, his withholding of removal claim also fails.

12

## D. Convention Against Torture

In order to obtain relief under CAT, the applicant carries the burden of proving "that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." *Pilica*, 388 F.3d at 951 (quoting 8 C.F.R. § 1208.16(c)(2)); *Castellano-Chacon v. INS,* 341 F.3d 533, 552 (6th Cir. 2003). "[A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity" constitutes torture. 8 C.F.R. § 1208.18(a)(1). An applicant for protection under CAT need not demonstrate that he is a member "of a particular social group being targeted." *Castellano-Chacon,* 341 F.3d at 552.

We agree with the BIA that the record is insufficient to prove either that future attacks by the Maras will more likely than not occur, or that such speculative future attacks would occur "with the consent or acquiescence of a public official." 8 C.F.R. § 1208.18(a)(1). Around ten years ago, the Maras violently attacked Diaz. His father reported that incident to the police, but although the police initially informed him that they would respond, they did nothing. Diaz had already fled to Mexico by the time any investigation would have taken place. A.R. at 187 (Merits Hr'g Tr.). The Maras continue to threaten his family and ask about Diaz's whereabouts. However, they have not attacked Diaz's parents and did not harm Diaz when he returned to Guatemala and remained hidden in his parents' home. Most importantly, there is nothing in the record that establishes that the police have had any knowledge of the Maras' pursuit of Diaz or threats made to his parents

since the day of the initial attack in 2008.  Diaz cannot carry his burden under CAT on such a record.

### III.  CONCLUSION

For the foregoing reasons, we **DENY** Diaz's petition for review.