NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0498n.06

No. 23-3186

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JOSE LUIS ALONZO-SIMAJ, | ) | **FILED**<br>Dec 05, 2023<br>KELLY L. STEPHENS, Clerk |
| Petitioner, | ) |  |
| v. | ) | ON PETITION FOR REVIEW FROM THE BOARD OF IMMIGRATION APPEALS |
| MERRICK B. GARLAND, Attorney General, | ) |  |
| Respondent. | ) | OPINION |

Before: BUSH, LARSEN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Gang members in Guatemala repeatedly robbed Jose Luis Alonzo-Simaj and threatened to kill him if he did not pay a weekly "fee" out of his bakery's earnings. These crimes led Alonzo-Simaj and his wife to flee to the United States. After he arrived, he applied for asylum and withholding of removal. But neither remedy offers relief to immigrants who are robbed or extorted in their home country by criminals acting solely for financial gain. An immigration judge thus denied Alonzo-Simaj's application, and the Board of Immigration Appeals upheld this decision. Substantial evidence supported their conclusion that Alonzo-Simaj suffered harm in Guatemala solely on account of the gang's desire for money. So although we have sympathy for his plight, we must deny his petition for review.

I

Alonzo-Simaj was born in Guatemala in 1996. While still a teenager, he began to date his future wife, Josselyn Morales-Velasquez. Josselyn's grandfather owned a family-run bakery. In 2014, Alonzo-Simaj took a job at this bakery helping the family package bread. The next year, he turned 18 and married Josselyn. Around this time, he also began driving the bakery's bread to various customers in the nearby communities.

Starting in January 2014, the family's bakery operations became a recurring target of gang violence at the hands of "Barrio 18" (also known as the "18th Street Gang," "Mara 18," or "M-18"). That month, armed gang members stole money from the bakery and held Alonzo-Simaj, his wife, and her sister "hostage" in the process. Admin. R. (A.R.) 90–91. Although this incident resulted only in "bruises," Alonzo-Simaj also suffered the traumatic "scare" of being held at gunpoint. A.R. 91.

The family lived without incident for over a year after the robbery because the police "chased" Barrio 18 out of their city. A.R. 91, 102–03. But the peace did not last. Alonzo-Simaj encountered the gang again in November 2015 on his way home from delivering bread. Gang members forced him out of his car. They then hit him with a gun, kicked him, "took all the money" from his sales, and demanded that he pay a weekly extortion fee. A.R. 92, 106–07. He suffered "bruises" again. A.R. 107.

After this second robbery, Alonzo-Simaj's father-in-law decided to transport the bread himself in order to keep Alonzo-Simaj safe. When the gang's extortion demand came due, though, armed gang members robbed and beat his father-in-law. Alonzo-Simaj and his father-in-law decided to stop making deliveries, and his wife's grandfather temporarily closed the bakery. Despite these precautions, gang members continued their threats over the phone and when they

saw the men on the street. The family did not report these threats to the police out of fear of retaliation. Instead, Alonzo-Simaj's father-in-law left for Mexico in January 2016.

That April, members of Barrio 18 stopped Alonzo-Simaj and his wife on their way home from a visit with his wife's grandfather at the bakery. They beat him, continued to demand that he pay the extortion fee, and threatened to rape his wife and murder them both if he refused. Gang members followed up a week later by demanding the fee and (falsely) accusing Alonzo-Simaj of killing a fellow gang member. The accusation led to more death threats. Scared for their lives, Alonzo-Simaj and his wife chose to leave Guatemala for the United States the next month.

Immigration authorities detained Alonzo-Simaj and his wife at the border in Texas. The authorities ordered Alonzo-Simaj to appear at removal proceedings. In those proceedings, he conceded his removability but requested asylum and withholding of removal. (He also requested protection under the Convention Against Torture but abandoned that claim.) As his basis for relief, Alonzo-Simaj alleged that gang members had harmed him because of his membership in two "particular social groups," which he described as family members of his wife and transportation workers.

An immigration judge denied relief. Two of the judge's findings matter now. First, the judge held that Alonzo-Simaj failed to prove that he suffered past persecution in Guatemala. The judge reasoned that he had not shown that the gang members targeted him because of his membership in the particular social groups that he identified. She instead found that they targeted Alonzo-Simaj because of his family's wealth, hoping to obtain their money. Second, the judge held that Alonzo-Simaj failed to establish that he had an objectively reasonable fear of future persecution in Guatemala. The lack of past persecution in the country meant that he could not rely on any regulatory presumption of future persecution. And he did not present enough evidence that

3

he would face harm from the gang members if he returned to Guatemala, especially considering that his wife's family had continued to operate the bakery. The Board of Immigration Appeals upheld these findings.

II

In his petition for review, Alonzo-Simaj challenges the rejection of his asylum and withholding-of-removal claims. When considering these challenges, we review the Board's legal conclusions (such as its interpretation of a statute) de novo. *See Guzman-Vazquez v. Barr*, 959 F.3d 253, 259 (6th Cir. 2020). But we review the administrative findings of fact under the deferential substantial-evidence test. *See Rodriguez de Palucho v. Garland*, 49 F.4th 532, 538–39 (6th Cir. 2022). We must treat those findings as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

A. Asylum

The immigration laws grant the Attorney General discretion to grant asylum to "refugees." *See id.* § 1158(b)(1)(A). Immigrants qualify as "refugees" only if they have suffered past "persecution" in their home country or have "a well-founded fear of persecution" there "on account of" certain protected traits, including their "race," "religion," or, as relevant here, "membership in a particular social group[.]" *Id.* § 1101(a)(42)(A). To prove that "persecution" has arisen or will arise "on account of" a protected trait, immigrants must show that this trait (such as their membership in a particular social group) "was or will be at least one central reason" for the persecution. *Id.* § 1158(b)(1)(B)(i). In other words, a "nexus" must exist between the immigrant's protected trait and the persecutor's infliction of harm: the former must motivate the latter. *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1137 (6th Cir. 2010); *see INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). And this motive issue raises a classic question of fact, so we must uphold the

4

immigration judge's findings on it as long as a reasonable adjudicator could have reached them. *See Elias-Zacarias*, 502 U.S. at 481; *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019).

We have repeatedly considered this "nexus" element in the context of gang violence. Immigrants regularly claim that gang members have targeted them because of their membership in various "particular social groups." Many immigrants have suggested that gangs harmed them because of their family relationships. *See Reyes Almendarez v. Barr*, 817 F. App'x 35, 39 (6th Cir. 2020); *Mateo-Vasquez v. Barr*, 822 F. App'x 317, 322 (6th Cir. 2020); *Lino-Sabio v. Barr*, 805 F. App'x 385, 388–89 (6th Cir. 2020) (per curiam); *Quintero-Florentino v. Barr*, 788 F. App'x 348, 350 (6th Cir. 2019) (per curiam); *Majano-De Hernandez v. Barr*, 777 F. App'x 810, 812 (6th Cir. 2019); *Cruz-Guzman*, 920 F.3d at 1037; *Lopez-Arias v. Barr*, 777 F. App'x 793, 797 (6th Cir. 2019); *Contreras-Torres v. Holder*, 542 F. App'x 456, 458 (6th Cir. 2013) (per curiam); *Bonilla-Morales*, 607 F.3d at 1137. Others have suggested that gangs harmed them because of their status as business owners. *See Alfaro-Urbina v. Barr*, 813 F. App'x 205, 209 (6th Cir. 2020); *Lorenzana-Montepeque v. Barr*, 781 F. App'x 490, 494 (6th Cir. 2019). And still others have argued that gang violence arose from their gender. *See Amaya-Hernandez v. Garland*, 2022 WL 1112771, at *2 (6th Cir. Apr. 14, 2022).

But these claims have generally failed when an immigration judge had an evidentiary-rooted basis to find that a different reason drove the gang members to harm an immigrant. Most commonly, we have upheld the finding that a gang committed crimes against an immigrant because of a desire for "financial gain" rather than the immigrant's family relationships. *Id.*; *Lino-Sabio*, 805 F. App'x at 389; *Cruz-Guzman*, 920 F.3d at 1037–38. As we said in one case, the immigrants' claims failed because the gang targeted them on account of their "perceived wealth" rather than their family identity. *Lopez-Arias*, 777 F. App'x at 797. Or, as we said in another, the immigrants'

claims failed because the gang targeted them out of a "desire for profit, not to harm [them] because of their family ties." *Majano-De Hernandez*, 777 F. App'x at 812.

Alonzo-Simaj's asylum claim has the same problem. He argues that he qualifies as a "refugee" because he suffered past persecution (and fears future persecution) "on account of" his "membership" in two purported "particular social group[s]": relatives of his wife and transportation workers. 8 U.S.C. § 1101(a)(42)(A). Like the Board, we need not decide whether these two groups could qualify as cognizable particular social groups within the meaning of the immigration laws. That is because a "reasonable adjudicator" could agree with the immigration judge that the Barrio 18 gang did not target Alonzo-Simaj because of his membership in either group. *See Rodriguez de Palucho*, 49 F.4th at 538 (quoting 8 U.S.C. § 1252(b)(4)(B)). This fact dooms both Alonzo-Simaj's claim that he suffered past persecution in Guatemala and his claim that he reasonably fears future persecution there.

Start with his claim of past persecution. The record contains overwhelming evidence that the gang extorted Alonzo-Simaj to obtain "money, and not on account of a protected ground." A.R. 3. To begin with, Barrio 18 gang members stole money from Alonzo-Simaj (or demanded it under threat of violence) during *every* encounter with him. In January 2014, they took "money from the bakery" at gunpoint even before Alonzo-Simaj became a transportation worker (his second purported social group). A.R. 90; *cf. Bonilla-Morales*, 607 F.3d at 1137. And when they accosted him while delivering bread in November 2015, they again stole money and demanded a "weekly" fee. A.R. 92. They engaged in a similar financially motivated robbery against his father-in-law a week later. A.R. 93. And they "demanded the fee" and threatened to kill Alonzo-Simaj and his wife if he did not pay during the final incident in April 2016. A.R. 96. This record shows that, as a gang member told Alonzo-Simaj, the gang "sought [him] out as a target for extortion for

the business." A.R. 91. In other words, the gang targeted Alonzo-Simaj because of his "*earnings from selling bread,*" not because of his family ties or status as a transportation worker. *Contreras-Torres*, 542 F. App'x at 458 (emphasis added).

Next, both Alonzo-Simaj and his wife admitted that the gang committed its crimes against him out of an "ordinary criminal desire for financial gain." *Cruz-Guzman*, 920 F.3d at 1037. When asked why gang members targeted him, Alonzo-Simaj opined it was "[b]ecause [he] worked for the bakery . . . and they wanted me to get a weekly fee for" the gang. A.R. 99; *cf. Contreras-Torres*, 542 F. App'x at 458. He did not mention his relationship to his wife or his transportation job as even a partial motivation. Alonzo-Simaj's wife similarly opined that the gang threatened to injure him "[b]ecause he wasn't agreeing to pay the extortion," not because of his relationship to her or his transportation job. A.R. 125; *cf. Alfaro-Urbina*, 813 F. App'x at 209.

Lastly, the gang's many other targets confirm that Alonzo-Simaj's relationship to his wife and his transportation job did not motivate the gang's crimes. Alonzo-Simaj noted that Barrio 18 gang members had been "robbing all the business" near the bakery. A.R. 115, 163. Why? The gang sought to obtain "easy money" by threatening the lives of anyone who operated businesses (and so likely had money). A.R. 116. Alonzo-Simaj's evidence about the general conditions in Guatemala reiterated that gangs, including Barrio 18, broadly "terrorize businesses and private citizens through targeted extortion attempts" designed to obtain money. A.R. 190. Barrio 18 gang members thus did not limit their many crimes to relatives of Alonzo-Simaj's wife or to deliverymen (Alonzo-Simaj's two particular social groups). Alonzo-Simaj's injuries instead arose on account of the gang's "indiscriminate" quest for criminal profit. *Lorenzana-Montepeque*, 781 F. App'x at 494 (citation omitted).

Turning to Alonzo-Simaj's alternative theory, the same evidence about the gang's motives for injuring him in the *past* also dooms his distinct claim that he reasonably fears *future* persecution if he returns to Guatemala. Alonzo-Simaj does not dispute the Board's conclusion that he has no forward-looking evidence to suggest that the gang would harm him based on a protected trait if he returned to Guatemala. After all, he conceded that his wife's grandfather now "runs" the bakery "business" without issue (although the grandfather no longer delivers baked goods outside the city). A.R. 112. Alonzo-Simaj instead claims that his past persecution required the immigration judge to presume that he had a "well-founded fear of persecution" in Guatemala. 8 C.F.R. § 1208.13(b)(1); *see Mbonga v. Garland*, 18 F.4th 889, 894–95 (6th Cir. 2021). To trigger this regulatory presumption, however, Alonzo-Simaj needed to connect his past injuries to his identified social groups. Because the immigration judge reasonably concluded that Alonzo-Simaj did not do so, he cannot invoke the presumption. *See Cruz-Guzman*, 920 F.3d at 1036–38. We thus must uphold the Board's rejection of his asylum claim.

## B. Withholding of Removal

Alonzo-Simaj's withholding-of-removal claim fails for the same reason. Unlike the discretionary asylum remedy, the withholding statute "compels" the Board to grant protection to immigrants who meet its elements. *Rodriguez de Palucho*, 49 F.4th at 536. Those elements require immigrants to prove that their "life or freedom would be threatened" in their home country "because of" one of the same protected grounds identified in the asylum statute, including their "membership in a particular social group[.]" 8 U.S.C. § 1231(b)(3)(A). Generally, immigrants must meet a "higher" standard to obtain withholding protection than asylum relief because the statute requires them to prove its elements under a "more likely than not" burden of proof. *Mbonga*, 18 F.4th at 899 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987)). At the

same time, we have held that the withholding statute's "nexus" element sets a lower substantive bar than its asylum counterpart. *See Guzman-Vazquez*, 959 F.3d at 272. Rather than prove that a protected ground was "one *central* reason" for the identified harm, 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added), immigrants need only show that the ground was "a reason" for that harm, *id.* § 1231(b)(3)(C).

This legal difference does not matter here. As the Board recognized, the immigration judge found as a fact that one—and only one—motive drove the gang's crimes against Alonzo-Simaj: "money." A.R. 3. The immigration judge's opinion did not suggest (let alone find) that Alonzo-Simaj's two social groups were even a partial reason for those crimes. To the contrary, the judge noted that he "was not targeted on account of his membership in any particular group." A.R. 48. Put another way, those particular social groups were neither a "central reason" nor "a reason" for the gang's crimes against Alonzo-Simaj. 8 U.S.C. §§ 1158(b)(1)(B)(i), 1231(b)(3)(C).

Alonzo-Simaj nevertheless asks us to remand because the Board did not expressly refer to our holding in *Guzman-Vazquez* that the withholding statute has a more lenient nexus test. 959 F.3d at 272. Yet the Board's decision mentioned neither the asylum statute's "central reason" test nor the withholding statute's "a reason" test. The Board likely did not raise this issue because Alonzo-Simaj's briefing before the Board did not flag or even cite *Guzman-Vazquez*. In all events, Alonzo-Simaj identifies no legal error in the Board's analysis. It properly upheld the immigration judge's factual finding that Barrio 18 was motivated *exclusively* by money and not by Alonzo-Simaj's claimed social groups. That finding simultaneously doomed Alonzo-Simaj's asylum and withholding claims even considering the latter statute's distinct test.

We deny the petition for review.

9